## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| ARCTIC GLACIER INTERNATIONAL, INC., | ) | Chapter 15 |
| | ) | |
| Debtors in a Foreign Proceeding. | ) | Case No. 12-10605 (KG) |
| | ) | |
| ——————————————— | ) | |
| | ) | |
| ELDAR BRODSKI ZARDINOVSKY a/k/a ELDAR BRODSKI a/k/a ELDAR BRODSKI (ZARDINOVSKY), *et al.*, | ) ) ) | |
| | ) | |
| Appellants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ARCTIC GLACIER INCOME FUND; JAMES E. CLARK; GARY A. FILMON; DAVID R. SWAINE; and HUGH A. ADAMS, | ) ) ) ) | Civ. No. 16-617-SLR |
| | ) | |
| Appellees. | ) | |
| | ) | |
| ——————————————— | ) | |

## APPELLEES' OPPOSITION BRIEF

Dated: October 21, 2016

Paul N. Heath (No. 3704)
Marcos A. Ramos (No. 4450)
Brendan J. Schlauch (No. 6115)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801

David Woodcock
Mark W. Rasmussen
Arielle S. Tobin
Allison L. Fuller
JONES DAY
2727 North Harwood Street
Dallas, TX 75201

## STATEMENT OF CORPORATE OWNERSHIP

As required by Federal Rule of Bankruptcy Procedure 8012(a), Appellee Arctic Glacier Income Fund states that it has no corporate parent, and no publicly-held corporation has informed Appellee that it owns 10% or more of its units.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................. 1

COUNTERSTATEMENT OF ISSUES ..................................................... 5

STANDARD OF REVIEW .......................................................................... 6

STATEMENT OF THE CASE ................................................................... 6

    A.    Arctic's Bankruptcy Proceedings .................................... 6

    B.    Distributions Under the Plan ........................................... 9

    C.    Releases of Liability ........................................................ 10

    D.    The Distribution in Accordance with the Plan and Court Orders ...................................................................... 12

    E.    Dismissal of Brodski's Claims ...................................... 14

SUMMARY OF ARGUMENT .................................................................. 14

ARGUMENT ................................................................................................ 15

I.    The Bankruptcy Court correctly dismissed Brodski's claims under *res judicata* ............................................................................ 15

    A.    The Bankruptcy Court correctly determined that Arctic was required to, and did, pay the distribution according to the Plan ................................. 15

    B.    The Bankruptcy Court correctly rejected the argument that Arctic was required to pay the distribution twice ........................................................ 20

II.    The Bankruptcy Court correctly ruled that the Plan release and court orders bar all of Brodski's claims ............................................ 24

    A.    The Bankruptcy Court correctly concluded that the court orders and Plan release cover the subject of Brodski's claims ........................................................... 24

    B.    The Bankruptcy Court correctly concluded that the Plan release and court orders are enforceable against Brodski and that his due process challenge has no merit ...................................................................... 27

III.    This Court should affirm on alternate grounds raised below ............ 34

-ii-

# TABLE OF CONTENTS
## (continued)

**Page**

A.  The fraud allegations do not give rise to a strong inference of scienter ...................................................... 34

B.  Brodski failed to plead actionable misrepresentations or justifiable reliance ..................... 36

C.  Brodski failed to show that the Arctic Parties owed him a duty to comply with Rule 10b-17 or the FINRA Rules ................................................................. 37

CONCLUSION ........................................................................... 39

# TABLE OF AUTHORITIES

**Page**

## CASES

*Ayco Co., L.P. v. Feldman,*
No. 1:10-CV-1213, 2010 WL 4286154 (N.D.N.Y. Oct. 22,
2010) ................................................................................ 38

*Bd. of Trs. of Trucking Emps. of N.J. Welfare Fund, Inc. v.
Centra,*
983 F.2d 495 (3d Cir. 1992) .......................................... 18

*Dana Corp. v. Fireman's Fund Ins. Co.,*
169 F. Supp. 2d 744 (N.D. Ohio 1999) ......................... 22

*E. Minerals & Chems. Co. v. Mahan,*
225 F.3d 330 (3d Cir. 2000) .......................................... 16

*First Union Commercial Corp. v. Nelson (In re Varat Enters.,
Inc.),*
81 F.3d 1310 (4th Cir. 1996) ........................................... 1

*Gold v. Ford Motor Co.,*
937 F. Supp. 2d 526 (D. Del. 2013) .............................. 39

*Goldie v. Cox,*
130 F.2d 695 (8th Cir. 1942) ......................................... 27

*Guthrie v. Lady Jane Collieries, Inc.,*
722 F.2d 1141 (3d Cir. 1983) .......................................... 6

*Holywell Corp. v. Smith,*
503 U.S. 47 (1992) ........................................................ 22

*In re ABC Learning Ctrs. Ltd.,*
728 F.3d 301 (3d Cir. 2013) .......................................... 25

## TABLE OF AUTHORITIES

<strong>Page</strong>

*In re Bowen,*
174 B.R. 840 (Bankr. S.D. Ga. 1994) ...................................................... 16

*In re Chance Indus.,*
367 B.R. 689 (Bankr. D. Kan. 2006) ...................................................... 33

*In re Diaz,*
459 B.R. 86 (Bankr. C.D. Cal. 2011) ...................................................... 22

*In re Dorr Pump & Mfg. Co.,*
125 F.2d 610 (7th Cir. 1942) ...................................................... 28

*In re DVI Inc. Sec. Litig.,*
249 F.R.D. 196 (E.D. Pa. 2008), *aff'd sub nom.*, 639 F.3d
623 (3d Cir. 2011) ...................................................... 37

*In re Howe,*
913 F.2d 1138 (5th Cir. 1990) ...................................................... 23

*In re KB Toys, Inc.,*
470 B.R. 331 (Bankr. D. Del. 2012) .................................................. 28, 33

*In re Metiom, Inc.,*
301 B.R. 634 (Bankr. S.D.N.Y. 2003) ...................................................... 28

*In re Szostek,*
886 F.2d 1405 (3d Cir. 1989) ...................................................... 16

*Jones v. Chemetron Corp.,*
212 F.3d 199 (3d Cir. 2000) .................................................. 33, 34

*Karathansis v. THCR/LP Corp.,*
No. 06-1591, 2007 WL 1234975 (D.N.J. Apr. 25, 2007) ................ passim

*Kushner v. Beverly Enters.,*
317 F.3d 820 ...................................................... 36

# TABLE OF AUTHORITIES

Page

*Longacre Master Fund, Ltd. v. ATS Automation Tooling Sys., Inc.*,
496 F. App'x 135 (2d Cir. 2012) ............................................................. 29

*Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*,
247 F.3d 44 (3d Cir. 2001)............................................................. 29, 31

*Miller v. United States (In re Miller)*,
284 B.R. 121 (N.D. Cal. 2002) ............................................................. 22

*Miller v. Wells Fargo Bank Int'l Corp.*,
540 F.2d 548 (2d Cir. 1976)................................................................. 29

*Morgan Olson L.L.C. v. Frederico (In re Grumman Olson Indus.)*,
467 B.R. 694 (S.D.N.Y. 2012)............................................................. 33

*Murphy v. Sofamor Danek Grp. (In re Sofamor Danek Grp.)*,
123 F.3d 394 (6th Cir. 1997)............................................................. 36

*Ohio v. Kovacs*,
469 U.S. 274 (1985)..................................................................... 22

*Oran v. Stafford*,
226 F.3d 275 (3d Cir. 2000)............................................................. 37

*Reconstituted Official Comm. of Unsecured Creditors of the United Healthcare Sys., Inc. v. N.J. Dept. of Labor (In re United Healthcare Sys., Inc.)*,
396 F.3d 247 (3d Cir. 2005)............................................................... 6

*Spruill v. Gillis*,
372 F.3d 218 (3d Cir. 2004)............................................................. 29

*Stratton v. Mariner Health Care, Inc. (In re Mariner Post-Acute Network, Inc.)*,
303 B.R. 42 (Bankr. D. Del. 2003)....................................................... 32

# TABLE OF AUTHORITIES

**Page**

*Sunbeam-Oster Co. v. Lincoln Liberty Ave., Inc.*,
  145 B.R. 823 (W.D. Pa. 1992) .................................................................. 22

*Swarts v. Siegel*,
  117 F. 13 (8th Cir. 1902) ......................................................................... 28

*Travelers Indem. Co. v. Bailey*,
  557 U.S. 137 (2009) ................................................................................ 24

**STATUTES**

11 U.S.C. § 1142 ........................................................................................ 15

**OTHER AUTHORITIES**

17 C.F.R. 240.10b-17 ................................................................................ 39

Appellees Arctic Glacier Income Fund ("Arctic"), James E. Clark, Gary A. Filmon, David R. Swaine, and Hugh A. Adams (referred to collectively as the "Arctic Parties") respectfully submit this brief in opposition to the appeal of the order entered by the U.S. Bankruptcy Court for the District of Delaware ("Bankruptcy Court") dismissing the claims of Eldar Brodski and his fellow Appellants (referred to collectively as "Brodski").

## PRELIMINARY STATEMENT

The Bankruptcy Court correctly dismissed Brodski's claims on two independent grounds, either one of which provides a basis for this Court to affirm. *First*, Brodski's claims are barred under principles of *res judicata*. The Plan of Arrangement—which was approved by over 99% of Arctic's voting unitholders, confirmed by the Canadian court overseeing the Canadian insolvency proceeding (the "Canadian Court"), and given full effect by the Bankruptcy Court in the underlying Chapter 15 proceeding— lays out the exclusive procedure for making distributions to the unitholders. There is no dispute that Arctic complied with the terms of the Plan when it made an initial distribution to registered unitholders as of the designated record date, December 18, 2015. There is also no dispute that Brodski was not a registered unitholder as of that date.

-1-

Orders confirming bankruptcy plans are final adjudications on the merits; thus, *res judicata* bars parties from re-litigating any aspect of a bankruptcy plan. The operation of *res judicata* in this context protects the finality and integrity of bankruptcy proceedings. Based on this well-established principle, the Bankruptcy Court correctly dismissed Brodski's claims because it recognized that the claims—"predicated on [Brodski's] not having received the initial distribution"—are a threat to the terms and finality of the Plan itself.

None of Brodski's arguments on appeal compels a contrary result. The Bankruptcy Court correctly rejected the argument that Arctic should have made the initial distribution in small "tranches" as an attempt to rewrite the Plan and court orders, which allowed "one, and only one" procedure for making distributions. Equally unpersuasive are Brodski's assertions that the Bankruptcy Court was required to "harmonize" the Plan with certain FINRA rules, and that it could do so by requiring Arctic to pay the initial distribution twice. In a case that addressed this precise issue and that Brodski badly misreads, the court held that the debtors were required to follow the bankruptcy plan, regardless of the requirements of FINRA rules, which did not "trump the confirmed Plan." *Karathansis v. THCR/LP Corp.*, No. 06-1591, 2007 WL 1234975, at *8 n.18 (D.N.J. Apr. 25, 2007). Contrary to

Brodski's contentions, *Karathansis* did not hold that the debtor should have paid twice; it simply recognized that the debtor may have to pay twice *because it failed the first time to comply with the confirmed plan*. That was not the case here.

*Second*, the Bankruptcy Court was also correct to dismiss Brodski's claims because the releases contained in the Plan and associated court orders bar any liability for acts or omissions "in any way related to" the Plan, including distributions under the Plan. These releases extend to claims that had not yet materialized when the Plan was confirmed, and are binding on not only existing unitholders, but also their "successors and assigns." Brodski's claims fall squarely with the scope of these releases. Brodski does not seriously contend otherwise, but instead recycles a number of meritless arguments to avoid the scope of the releases.

As an initial matter, his arguments do not address the fact that the court orders expressly barred any liability against the Arctic Parties for making payments and distributions to unitholders under the Plan. This omission alone supports the dismissal of Brodski's claims. Equally meritless is Brodski's due process argument. Brodski bought his units from unitholders who voted to accept the Plan (or were at least bound by the unitholder vote for the Plan) and in so doing, he stepped into their shoes,

accepting all of the rights and obligations that came with the units. Brodski's argument that his specific claims could not have been released by the voting unitholders is also wrong. The releases bar claims made by any person at any time in connection with the Plan. Nor can Brodski evade dismissal by claiming that he lacked sufficient notice of the Plan, when the original unitholders indisputably had sufficient notice. To rule otherwise would undermine the certainty and finality the Plan was intended to provide.

*Third*, this Court may affirm on other grounds that the Arctic Parties raised below, but were not addressed by the Bankruptcy Court. Brodski's allegations of fraud may be dismissed because there is not a single factual allegation that the Arctic Parties acted with the requisite scienter. Similarly, the misrepresentation claims fail as a matter of law because Brodski has not adequately alleged actionable omissions or justifiable reliance. And the negligence claims do not satisfy the pleading requirements because Brodski cannot show as a matter of law that the Arctic Parties owed him any duty to comply with Rule 10b-17 or the FINRA rules. For any or all of these reasons, this Court should affirm the ruling of the Bankruptcy Court.

## COUNTERSTATEMENT OF ISSUES

1.     An order confirming a bankruptcy plan constitutes a final judgment on the merits that bars parties, under the doctrine of *res judicata*, from re-litigating parts of the plan. There is no dispute that Arctic followed the confirmed Plan when paying the initial distribution to unitholders. Did the Bankruptcy Court correctly conclude that the doctrine of *res judicata* bars Brodski's claims, which are premised on rewriting the terms of the Plan for making distributions to unitholders?

2.     The confirmed Plan and court orders approving the Plan expressly release and discharge the Arctic Parties from liability for any claims in any way related to, arising out of, or in connection with the Plan and the payment of distributions under the Plan. Brodski has asserted claims against the Arctic Parties related to the payment of distributions under the Plan. Did the Bankruptcy Court properly hold that the releases bar those claims?

3.     Notwithstanding the applicability of *res judicata* and the releases to Brodski's claims, should this Court affirm on other grounds—no allegations of scienter in Brodski's fraud claims; no sufficient allegations of actionable omissions or reliance in his misrepresentation claims; no legal

duty in his negligence claims—that were raised by the Arctic Parties but not ruled upon by the Bankruptcy Court?

## STANDARD OF REVIEW

When reviewing an order granting a motion to dismiss from a bankruptcy court, the appellate court reviews the ruling *de novo*. *See Reconstituted Official Comm. of Unsecured Creditors of the United Healthcare Sys., Inc. v. N.J. Dept. of Labor (In re United Healthcare Sys., Inc.)*, 396 F.3d 247, 249 (3d Cir. 2005) (holding that legal determinations are reviewed *de novo*). This Court may affirm the Bankruptcy Court's ruling on any ground that is in the record. *Guthrie v. Lady Jane Collieries, Inc.*, 722 F.2d 1141, 1145 n.1 (3d Cir. 1983).

## STATEMENT OF THE CASE

On October 15, 2015, Brodski brought a post-petition adversary complaint against the Arctic Parties. The Arctic Parties moved to dismiss the complaint on January 21, 2016. The Bankruptcy Court dismissed Brodski's claims in their entirety on July 13, 2016. (A 1681; A 1728–29).

### A.     Arctic's Bankruptcy Proceedings

Arctic was headquartered in Canada and was an income trust that owned a group of companies that manufactured and distributed packaged ice. (A 92). Arctic was listed on the Canadian Securities Exchange ("CSE"). (A 75). On February 22, 2012, Arctic commenced restructuring proceedings

in Canada under the Companies' Creditors Arrangement Act (the "CCAA"). (A 6). Under the Canadian Court's initial order, Alvarez & Marsal Canada Inc. was appointed Monitor of Arctic's business and financial affairs. (A 89). On February 22, 2012, the Monitor commenced ancillary proceedings in the Bankruptcy Court under Chapter 15 of the United States Bankruptcy Code. (A 92–93).

In the CCAA proceedings and under the supervision of the Monitor and the Canadian Court, Arctic sold substantially all of its business and assets. (A 5). The proceeds were sufficient to pay Arctic's secured creditors in full. *Id.* The remaining proceeds were held by the Monitor pending determination of the amount of creditor claims and the filing of a Plan of Arrangement under the CCAA to govern the distribution of the remaining proceeds to unsecured creditors and, to the extent that all creditors could be paid in full, to make distributions to Arctic's unitholders. (A 144–97).

Arctic held a meeting of unitholders to consider and vote on the Plan, and notice of the meeting was provided to all unitholders. (A 401 at ¶ 5.10). The Canadian Court found there had been sufficient notice to unitholders about the meeting, as well as sufficient service of documents related to the meeting. (A 587 at ¶ 3). The Plan was approved by 99.81% of all unitholders who voted, and over 65% of unitholders voted. (A 199; A 441). Each

unitholder was deemed to have consented and agreed to all of the provisions of the Plan, including the releases. (A 592 at ¶ 19). Once approved, the Plan was binding not only on the voting unitholders but also on their "successors and assigns." (A 161 at § 1.3). The Canadian Court approved and sanctioned the Plan on September 5, 2014 (the "Sanction Order"), and the Plan Implementation Date was January 22, 2015. (A 584; A 199). The Sanction Order declared that the terms of the Plan governed the conduct of the Arctice Parties and authorized them "to take all steps and actions necessary or appropriate to implement the Plan." (A 589–90 at ¶ 12).

The Bankruptcy Court expressly recognized the Sanction Order and gave full effect to its provisions throughout the United States (the "Recognition Order"). (A 461). It also ruled that "due and sufficient notice" of the motion seeking approval of the Sanction Order and the Sanction Order had been given and that "no other notice or further notice need be provided." (A 461). The contents of the Plan were fully disclosed to the public by Arctic, and the entire Plan was published on a website maintained by the Monitor. (A 203). All material steps in the restructuring, including the initial unitholder distribution, were publicly disclosed by Arctic before implementation of the Plan. *See id.*

## B.    Distributions Under the Plan

Section 6.2 of the Plan set forth the procedure for making distributions to unitholders, under which the Monitor would declare a record date that would determine which unitholders were eligible to receive the distribution and the transfer agent would pay the distribution to each registered unitholder as of that record date. (A 168 at § 6.2). The record date had to be at least 21 days before the date that the distribution was made to the eligible unitholders. (A 159). Section 8.3 of the Plan specifies that the Monitor is permitted to make distributions only "in accordance with" the distribution procedure in Section 6.2 of the Plan. (A 174).

The Sanction Order makes clear that the Plan's distribution procedure is comprehensive and precludes, at the Monitor's discretion, any authority beyond the CCAA, the Plan, and the court orders:

> THIS COURT ORDERS AND DECLARES that, in addition to the Monitor's prescribed rights under the CCAA . . . the Monitor and CPS are empowered and authorized before, on or after the Plan Implementation Date, to take such additional actions and execute such documents . . . *as the Monitor and the CPS consider necessary or desirable* in order to perform their respective functions and fulfill their respective obligations under the Plan . . . and to facilitate the implementation of the Plan and the completion of the CCAA Proceedings, including to . . . (ii) *administer and distribute the Available Funds*, (iii) establish, hold, administer and distribute . . . *the Unitholders' Distribution Cash Pool*, . . . (v) effect . . . *distributions to the Transfer Agent in respect of distributions to be made to Unitholders* . . . and, in each case where the Monitor or CPS, as

> the case may be, takes such actions or steps, ***they shall be exclusively authorized and empowered to do so, to the exclusion of all other Persons*** including the Artic Glacier Parties, and ***without interference from any other Person***.

(A 598 at ¶ 34 (emphasis added)). It specifically empowers the Monitor to administer and distribute funds to unitholders "without interference from any other Person," which includes any "Government Authority or any agency, regulatory body, officer or instrumentality thereof or any other entity, wherever situated or domiciled." *Id.*

### C.    Releases of Liability

Section 9.1 of the Plan explicitly releases the Arctic Parties from liability for any claims made in connection with the Plan. (A 175–76). The Plan makes clear that the Arctic Parties "shall be released and discharged from any and all demands . . . based in whole or in part on any omission, transaction, duty . . . arising out of or in connection with . . . the … Plan." *Id.*

The Canadian Court expressly sanctioned and approved this release in the Sanction Order: "[T]he Plan (including without limitation . . . the releases set out therein) is hereby sanctioned and approved pursuant to the CCAA." (A 588 at ¶ 9; *see also* A 589–95 at ¶¶ 11, 28). Moreover, the Canadian Court specifically released all claims arising out of the payment of the distribution:

> THIS COURT ORDERS that none of the Monitor, the CPS, the
> Trustees, the Arctic Glacier Parties, or any individuals related
> thereto shall incur any liability as a result of payments and
> distributions to Unitholders, in each case on behalf of AGIF,
> once such distribution or payment has been made by the
> Monitor to, and confirmation of receipt has been received by
> the Monitor from, the Transfer Agent.

(A 600–01 at ¶ 40; *see also* A 590 at ¶ 14).

In the Recognition Order, the Bankruptcy Court gave all provisions in
the Sanction Order "full force and effect in the United States" and further
declared that no liability can arise from Arctic's compliance with the Plan:
"Neither the Debtors nor the Monitor shall incur any liability as a result of
acting in accordance with the terms of the Plan and this Sanction
Recognition Order." (A 465 at ¶ 9). The Recognition Order also granted the
Arctic Parties a broad release that was substantially the same as the one in
the Plan, discharging any claims, "whether known or unknown, matured or
unmatured," arising out of or "in any way related" to the Plan, the
bankruptcy proceeding, or Arctic's business affairs:

> . . . Debtors . . . the Trustees, the Directors and the Officers . . .
> shall be released and discharged from any and all demands. . .
> including any and all claims. . . whether known or unknown,
> matured or unmatured, direct, indirect or derivative, foreseen or
> unforeseen, existing or hereafter arising, based in whole or in
> part on any omission, transaction, duty, responsibility,
> indebtedness, liability, obligation, dealing or other occurrence
> taking place on or prior to the later of the Plan Implementation
> Date and the date on which actions are taken to implement the
> CCAA Plan that are in any way related to, arising out of or in

connection with the Claims, the Debtor's business affairs whenever or however conducted, the Plan, the Canadian Proceedings and the Chapter 15 Cases . . . .

(A 463–64 at ¶ 5).

## D.    The Distribution in Accordance with the Plan and Court Orders

On December 11, 2014, Arctic published legal notices in three newspapers (the *Wall Street Journal*, the *Winnipeg Free Press*, and the *Globe & Mail*) disclosing that the Unitholder Distribution Record Date was December 18, 2014, and stating that only holders of units of the Fund as of the record date would receive the initial distribution under the Plan. (A 554; A 556; A 558).

In addition, Arctic disclosed this same information in a press release that was issued and posted to CSE on December 15, 2014. (A 6 at ¶ 31; A 560). The disclosure further noted that the amount of the distribution had not been established as of the date of that release. *Id.* Both the press release and a Material Change Report were filed on SEDAR[1] on the same date. (A 563).[2] The Material Change Report summarized the material change as follows:

---

[1] SEDAR is the electronic filing system for the disclosure documents of public companies and investment funds across Canada. Documents posted on SEDAR are available to the public. (A 43).
[2] All relevant information about the CCAA proceedings, the Plan, and all related press releases was posted to the Monitor's website throughout the relevant time period.

> Arctic Glacier Income Fund (the "Fund") announced on December 11, 2014 that unitholders of the Fund as of December 18, 2014 will be entitled to receive the initial distribution from the Fund pursuant to the Plan of Compromise or Arrangement . . . approved by the unitholders on August 11, 2014 (the "Plan"). The date and value of this distribution will be announced by way of a press release once such information is determined.

(A 563–64).

A January 9, 2015 press release then noted that the Fund was working to implement the Plan as soon as possible. Furthermore, the release reiterated: "As previously announced by the Fund on December 15, 2014, the date and value of the initial distribution to unitholders of the Fund, as contemplated in the Plan, will be announced by way of a press release once such information is determined." (A 569).

A January 21, 2015 press release announced that the Plan Implementation Date would be January 22, 2015. As such, "unitholders of the Fund as of December 18, 2014 (the 'Record Date') were entitled to receive an initial distribution from the Fund pursuant to the Plan of $0.155570 USD per unit of the Fund held on the Record Date." (A 572–73). On January 22, 2015, the Fund paid, through a transfer agent, a distribution of $0.155570 USD per unit to the unitholders of record as of the Unitholder Distribution Record Date. (A 8–9 at ¶¶ 39–40).

### E.     Dismissal of Brodski's Claims

On October 30, 2015, Brodski commenced an adversary proceeding, alleging six claims: two common law claims for negligence against all Defendants (Counts I and II), breach of fiduciary duty against the Individual Defendants (Count III), negligent misrepresentation against Arctic (Count IV), a violation of Section 10(b) and Rule 10b-5 of the Securities Exchange Act against Arctic (Count V), and common law fraud against Arctic (Count VI). (A 18–24 at ¶¶ 84–123).

On July 13, 2016, the Bankruptcy Court dismissed the complaint, holding that the Plan's distribution procedure is an adjudication that supersedes any conflicting obligations that Brodski seeks to impose through the claims asserted. (A 1712–14). The Bankruptcy Court also held that the releases in the Plan and related orders barred Brodski's claims. (A1720–21). On July 19, 2016, Brodski filed a Notice of Appeal. (A 1730).

## SUMMARY OF ARGUMENT

The Bankruptcy Court correctly dismissed Brodski's claims on two independent grounds. First, Brodski's claims are barred under principles of *res judicata* because they conflict with the Plan's distribution procedure. Second, the Plan release and court orders expressly bar liability for acts or omissions "in any way related to" the Plan, including distributions under the

Plan. In addition, there are several other grounds sufficient to affirm that were raised by the Arctic Parties but not ruled on by the Bankruptcy Court.

## ARGUMENT

### I.    The Bankruptcy Court correctly dismissed Brodski's claims under *res judicata*.

The Bankruptcy Court correctly ruled that Brodski's claims are barred under principles of *res judicata* because they conflict with the exclusive distribution procedure provided by the Plan and confirmed by subsequent court orders.

#### A.    The Bankruptcy Court correctly determined that Arctic was required to, and did, pay the distribution according to the Plan.

The Bankruptcy Court correctly held that the Arctic Parties were required to, and did, pay the distribution according to the Plan. By statute in the United States and Canada, a debtor has a duty to comply with and implement the terms of a confirmed bankruptcy plan and the related court orders. In the United States, a debtor "shall carry out the plan and shall comply with any orders of the court." 11 U.S.C. § 1142. And in Canada, a debtor must "generally do all such acts and things in relation to [its] property and the distribution of the proceeds among [its] creditors as may be . . . directed by the court by any special order." (A 974–76). As a matter of law,

the Arctic Parties could do nothing other than comply with the terms of the Plan.

A confirmed bankruptcy plan is a contract binding on all parties, including the debtor and creditors. *Karathansis*, 2007 WL 1234975, at *5 (citing *First Union Commercial Corp. v. Nelson (In re Varat Enters., Inc.)*, 81 F.3d 1310, 1317 (4th Cir. 1996)). An order confirming a plan under the bankruptcy code constitutes a final judgment on the merits that bars parties, under the doctrine of *res judicata*, from re-litigating parts of the plan. (A 1712–13); *see also E. Minerals & Chems. Co. v. Mahan*, 225 F.3d 330, 336 n.11 (3d Cir. 2000); *In re Szostek*, 886 F.2d 1405, 1408 (3d Cir. 1989); *In re Bowen*, 174 B.R. 840, 847 (Bankr. S.D. Ga. 1994). Here, the Plan and court orders are final adjudications that bar Brodski's claims.

As the Bankruptcy Court concluded, Section 6.2 of the Plan expressly lays out the exclusive procedure for how Arctic was to make distributions to unitholders:

> The Monitor shall declare a Unitholder Distribution Record Date prior to any distribution, deemed or otherwise, from the Unitholders' Distribution Cash Pool. On the Plan Implementation Date or on any Distribution Date, . . . the Monitor shall transfer amounts . . . on behalf and for the account of the Fund . . . to the Transfer Agent. . . . [T]he Transfer Agent shall distribute each Unitholder Distribution . . . to each Registered Unitholder, as of the applicable Unitholder Distribution

> Record Date . . . based on each Registered Unitholder's
> Pro Rata Share . . . .

(A 168 at § 6.2). Arctic executed this procedure just as the Plan requires:  On December 11, 2014, Arctic published legal notices in three newspapers, disclosing that the Unitholder Distribution Record Date would be December 18, 2014, and stating that only holders of units of the Fund as of the record date would receive the initial distribution under the Plan. Then, on January 22, 2015, the Monitor, on behalf of Arctic, transferred the initial distribution to the transfer agent, which in turn paid it to the Registered Unitholders as of December 18, 2014. The Bankruptcy Court correctly ruled that this procedure is an "adjudication" that supersedes the FINRA rules based on the doctrine of *res judicata*,[3] and dismissed Brodski's claims because they improperly seek to impose an additional duty, based on FINRA rules, that is contrary to what is required by the Plan.

In this vein, Brodski argues that there was "nothing in the Plan that eliminated the Arctic Parties common law and statutory obligations to make" the disclosures he alleges should have been made. (App. Op. Br. at 22). He ignores what the Bankruptcy Court recognized: that the Plan provided "one, and only one" path for making distributions. (A 1689).

---

[3] Brodski falsely claims that the Arctic Parties did not cite the doctrine of *res judicata* as a basis for dismissal of the claims. (App. Op. Br. at 15). But they clearly did, arguing that "a confirmation order is *res judicata* as to all issues decided or which could have been decided at the hearing on confirmation." (A 50).

Nothing in the Plan required the Arctic Parties to comply with FINRA rules or make the disclosures Brodski demands. In fact, compliance with such additional obligations would have conflicted with the Plan. (A 598 at ¶ 34; A 1716–17). Moreover, there is no allegation that Arctic ever disclosed information on the OTC market, where Brodski bought his units, or that it was even required to do so.[4]

To avoid this conclusion, Brodski argues that the doctrine of *res judicata* cannot apply to his claims because they purportedly arose after confirmation of the Plan. (*See* App. Op. Br. at 15, 22). But the implementation date of the Plan was January 22, 2015, *after* all of Brodski's claims had arisen, so as a chronological matter, Brodski's argument fails. More fundamentally, though, the doctrine of *res judicata* is meant to give "dispositive effect to a prior judgment if a particular issue, although not litigated, *could have been raised in the earlier proceeding.*" *Bd. of Trs. of Trucking Emps. of N.J. Welfare Fund, Inc. v. Centra*, 983 F.2d 495, 504 (3d Cir. 1992) (emphasis added). In this case, the issue that Brodski's claims raise, and that is barred by *res judicata*, is how distributions should have been made under the Plan. This issue was addressed before the Plan was

---

[4] This argument fails for other reasons as well. It is beyond dispute that the Arctic Parties owed Brodski no duty to comply with FINRA rules. *See infra* Section III.C. And, as discussed below, the releases are broad enough to bar all claims, including Brodski's omission claims. (A 175–76 at § 9.1 ("all claims arising out of such actions or omissions shall be forever waived")); *see also infra* Section II.

confirmed. After confirmation, the distribution procedure contained in the Plan became a final adjudication that was binding on all parties and cannot be re-litigated.[5]

Brodski also argues that Arctic should have paid the distribution differently than what was required by the Plan—that is, by paying it in small "tranches" of less than 25% of the value of the units. Again, as the Bankruptcy Court recognized, the Plan presented "one, and only one, procedure for making distributions."[6] (A 1689). It "makes no distinction between small and large dividends" and it is "clearly intended to apply to any dividend, of whatever size." (A 1716). Further, Section 8.3 and Schedule B of the Plan do not allow for distributions to be made in any manner other than in accordance with Section 6.2. (A 1692). Nor is there any reference in Section 6.2 that suggests that the payment procedure was subject to the requirements of any other applicable law, such as FINRA

---

[5] None of the cases cited by Brodski compels a different conclusion. (App. Op. Br. at 15). In *Donaldson v. Bernstein*, the trustee's action was not barred by *res judicata* precisely because the debtor had failed to comply with the bankruptcy plan, which is the opposite of what happened here. 104 F.3d 547, 554–55 (3d Cir. 1996). In *J & K Adrian Bakery, LLC v. Dayton Superior Corp. (In re Dayton Superior Corp.)*, the court found that the claims pertained solely to post-confirmation activities. No. 12-50950, 2013 WL 153744, at *4–5 (Bankr. D. Del. Jan. 15, 2013). Here, in contrast, Brodski asserts that the Arctic Parties were wrong for following the distribution procedure in the Plan, not for unrelated post-confirmation issues.

[6] The Plan requires the Monitor to "transfer amounts as determined by the Monitor in accordance with the Consolidated CCAA Plan . . . from the Unitholders' Distribution Cash Pool . . . to the Transfer Agent." The Unitholders' Distribution Cash Pool is defined as "an amount equal to the Available Funds less the amounts used to fund the: (a) Administrative Costs Reserve; (b) Insurance Deductible Reserve; (c) Unresolved Claims Reserve; and (d) Affected Creditors' Distribution Cash Pool." (A 167–68 at §§ 5.6, 6.2). The explicit language of the Plan does not allow for the Monitor to modify the amount or timing of a distribution.

rules. (A 1693). This absence is telling in light of the fact that other provisions within the Plan specifically are subject to the provisions of applicable law. *Id.* Moreover, the Sanction Order states that the Plan's distribution procedure is comprehensive, and it authorized Arctic, through the Monitor, to make distribution payments "without interference from any other Person," which includes any government, regulatory body, or administrative authority. (A 598 at ¶ 34).

Besides violating the Plan, Brodski's tranche proposal would not even help him. Had Arctic paid the distribution in several small tranches, as Brodski urges, the payments would not have even gone to Brodski: Per FINRA rules (which he says apply), distributions under 25% of the units' value would have been made to unitholders as of the record date, just like the Plan required, and that would not have included Brodski. So Brodski would not have benefited even if Arctic had paid in smaller tranches. In short, Brodski's tranche argument is meritless and irrelevant, and this Court should affirm.

### B. The Bankruptcy Court correctly rejected the argument that Arctic was required to pay the distribution twice.

The Bankruptcy Court correctly rejected Brodski's argument that it was obliged to "harmonize" the Plan's payment procedure with FINRA rules and require Arctic to pay the distribution twice. Brodski says that the

*Karathansis* opinion requires this outcome, but he badly misreads that decision.

In *Karathansis*, former shareholders claimed that they were entitled to receive a distribution under a bankruptcy plan because they held the shares on the record date established by the plan, even though they had sold their shares before the effective date of the plan. 2007 WL 1234975, at *3. The debtors objected, arguing that under UPC Rule 11140 (the same rule Brodski relies on here), the plan distributions should go to the subsequent purchasers and not to the holders as of the record date, as required by the bankruptcy plan in that case. *Id.* at *4. The court rejected the debtors' argument, holding that the bankruptcy plan controlled the distributions. *Id.* at *8.

Brodski is therefore simply wrong about *Karathansis*. Nowhere in that decision did the court rule or even suggest that the plan and FINRA rules had to be "harmonized." Nor did *Karathansis* hold that a debtor must follow the FINRA rules in making the distribution; rather, it held just the opposite, ruling that the debtors must pay the distribution according to the bankruptcy plan, notwithstanding the fact that they had already paid based on FINRA rules. *Id.* at *8 ("[T]his Court finds that the [former shareholders] are nonetheless still entitled to the Plan distributions under Section 3.04(k)(ii) notwithstanding UPC Rule 11140."). In other words, *Karathansis* directly

supports the Bankruptcy Court's ruling that Arctic was obligated to follow the Plan, irrespective of the FINRA rules.[7]

Along these same lines, Brodski is wrong that Arctic should have paid the distribution twice to harmonize the Plan with FINRA rules. There simply is no support for this in *Karathansis*. The U.S.-based debtors paid twice there because they had already "subjected" themselves to the FINRA rules and paid under them, and now were required to pay according to the bankruptcy plan.[8] Nothing in the decision even remotely suggests that, had the debtors first paid according to the plan, they would have been required to pay again to satisfy FINRA rules.

Nor would requiring two payments be permissible here. It would violate the Sanction Order, as the Bankruptcy Court held, because "it would impose an obligation on the Monitor that the Monitor did not choose." (A 1719). And it would add an extra step to the Plan's distribution procedure,

---

[7] Nor can Brodski find any support in any of the other cases he cites. (App. Op. Br. at 14–15). Neither *Holywell Corp. v. Smith*, 503 U.S. 47 (1992) nor *Ohio v. Kovacs*, 469 U.S. 274 (1985) involved the application of any provision of a confirmed bankruptcy plan. And *In re Diaz*, 459 B.R. 86 (Bankr. C.D. Cal. 2011) and *Dana Corp. v. Fireman's Fund Ins. Co.*, 169 F. Supp. 2d 744 (N.D. Ohio 1999) required the court to interpret provisions of a confirmed plan that might conflict with a court order, not FINRA regulations. In *Sunbeam-Oster Co. v. Lincoln Liberty Ave., Inc.*, 145 B.R. 823 (W.D. Pa. 1992), the court was asked to determine whether the bankruptcy court had erred in awarding interest on an allowed creditor's claim where the bankruptcy plan was silent on the issue. Finally, in *Miller v. United States (In re Miller)*, 284 B.R. 121 (N.D. Cal. 2002), the court interpreted a facially ambiguous plan provision in accordance with the result dictated by the Bankruptcy Code. Here, the Plan provisions concerning the distribution procedure are clear and unambiguous.

[8] The *Karathansis* court did not address the possible unjust enrichment that could arise from this outcome and remanded to the bankruptcy court for further proceedings. 2007 WL 1234975, at *9.

which the Plan does not allow. Further, paying twice would harm the unitholders who did not trade their units by reducing their later distributions. An express purpose of the Plan was to "provide for the distribution of any surplus of the Available Funds to each unitholder, in the amount of their Pro Rata Share." (A 162). The term "Pro Rata Share" is defined in the Plan as "the percentage that the Trust Units held by a Unitholder at the applicable Unitholder Distribution Record Date bears to the aggregate of all Trust Units, calculated as at the applicable Unitholder Distribution Record Date." (A 157). Paying a distribution twice would violate these provisions because each unitholder then would not receive its pro rata share as of the applicable record date. And it could subject the Arctic Parties to liability for not following the Plan from unitholders who did not receive their pro rata share.

In the end, the Arctic Parties had a duty to follow the Plan, not the FINRA rules. *In re Howe*, 913 F.2d 1138, 1143 (5th Cir. 1990) (stating that it "is well settled that a plan is binding upon all parties once it is confirmed"); *Karathansis*, 2007 WL 1234975, at *8 n.18 (bankruptcy court decision interpreting "UPC 11140 as to trump the confirmed Plan constitutes an errant conclusion of law"). They did so, and the Bankruptcy Court's dismissal of Brodski's claims on *res judicata* grounds should be affirmed.

## II.   The Bankruptcy Court correctly ruled that the Plan release and court orders bar all of Brodski's claims.

This Court may also affirm on the basis of the Bankruptcy Court's alternate ruling that the broad releases in the Plan and the related court orders bar all of Brodski's claims.

### A.   The Bankruptcy Court correctly concluded that the court orders and Plan release cover the subject of Brodski's claims.

The Bankruptcy Court correctly held that the court orders and Plan release shield the Arctic Parties "from liability for any actions or omissions related to, arising out of, or connected to the Plan." (*See* A 1699–1704; A 175–76 at § 9.1; A 588–95 at ¶¶ 9, 11, 14, 16, 28, 29; A 462–65 at ¶¶ 2, 5, 9).

Using expansive language, the Plan's release bars all claims against the Arctic Parties for acts or omissions "in any way related to, or arising out of or in connection with" the Plan or distributions under the Plan. (A 175–76 at § 9.1); *see Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 148–49 (2009) (holding that the phrase "in relation to" is expansive in the context of a bankruptcy release). The Canadian Court expressly approved this release several times in the Sanction Order. (A 588–95 at ¶¶ 9, 11, 28). In addition, the Sanction Order contains its own broad releases that specifically order

that the Arctic Parties cannot be liable for any claims arising out of the payments and distributions under the Plan to unitholders:

> THIS COURT ORDERS that none of the Monitor, the CPS, the Trustees, the Arctic Glacier Parties, or any individuals related thereto shall incur any liability as a result of payments and distributions to Unitholders, in each case on behalf of AGIF, once such distribution or payment has been made by the Monitor to, and confirmation of receipt has been received by the Monitor from, the Transfer Agent.

(A 600–01 at ¶ 40; *see also* A 592–601 at ¶¶ 19, 29, 40). There is no dispute that the Monitor made the payment to the Transfer Agent and that the Transfer Agent confirmed receipt.

In the Recognition Order, the Bankruptcy Court gave all provisions in the Sanction Order "full force and effect in the United States." (A 462 at ¶ 2); *In re ABC Learning Ctrs. Ltd.*, 728 F.3d 301, 306 (3d Cir. 2013) (stating that the purpose of a Chapter 15 proceeding is "to maximize assistance to the foreign court conducting the main proceeding") (internal citations omitted). In addition, the Bankruptcy Court declared that no liability can arise from Arctic's compliance with the Plan or the Sanction Order. (A 465 at ¶ 9). It also included in the Recognition Order its own broad release that is substantially the same as the one in the Plan. (A 463–64 at ¶ 5). Brodski never once addresses the substance of the court orders in his appeal brief.

Brodski's claims fall squarely within the scope of the Plan release and court orders. The releases took effect on the Plan Implementation Date, January 22, 2015. (A 175–76 at § 9.1; A 589–96 at ¶¶ 11, 19, 29; A 463–64 at ¶ 5). By their explicit terms, the releases cover the entire period during which the alleged acts of misconduct occurred, namely the period between December 2014 and January 2015, up to and including the date upon which Arctic, through the Monitor, made the initial distribution to unitholders. (*See* A 1720). And the broad releases make it clear that the Arctic Parties cannot be held liable for any conduct "in any way related to, or arising out of or in connection with" the administration of the Plan and the distribution to unitholders. (A 175–76 at § 9.1; *see also* A 463–64 at ¶ 5; A 600–01 at ¶ 40). Brodski cannot deny that his claims "arise out of" and are "related to" the Plan. As the Bankruptcy Court correctly noted, because all of Brodski's claims are predicated on not having received the distributions to unitholders, the claims clearly relate to, arise out of, or are in connection with the Plan's distribution procedure and are therefore extinguished pursuant to the releases. (A 1721). The Bankruptcy Court's ruling should be affirmed.

**B.     The Bankruptcy Court correctly concluded that the Plan release and court orders are enforceable against Brodski and that his due process challenge has no merit.**

As he did below, Brodski does not seriously dispute that the broad scope of the releases encompasses his claims. Indeed, he wholly fails to address the fact that the court orders bar all liability for distributions made under the Plan, which alone justifies affirming the ruling. Instead, Brodski contends that (1) that the voting unitholders did not assign their rights and obligations under the Plan to Brodski when he bought their units; (2) that the voting unitholders could not have released Brodski's claims; and (3) that Brodski was not represented in the Canadian bankruptcy proceedings by the voting unitholders. The Bankruptcy court rejected these arguments, and this Court should do the same. (A 1724–25).

**1.     Brodski stands in the original unitholders' shoes.**

Brodski contends that he was not bound by the voting unitholders' acceptance of the Plan, notwithstanding the fact that he bought his units from those unitholders. It is a long-standing principle of law, however, that a buyer of a claim in an insolvency proceeding does not enjoy greater rights than the original claim holder; to the contrary, the buyer "stands in the shoes of the assignor." *Goldie v. Cox*, 130 F.2d 695, 720 (8th Cir. 1942) (citing *Fid. Mut. Life Ins. Co. v. Clark*, 203 U.S. 64, 74 (1906)); *see also* Mark S.

Rhodes, Transfer of Stock § 7.1 (7th ed. 2007) ("As a general rule, the [stock] transferee takes no greater rights and is subject to the same liabilities as the [stock] transferor.").

This legal principle has been applied consistently throughout the United States for decades. *See, e.g.*, *In re KB Toys, Inc.*, 470 B.R. 331, 335 (Bankr. D. Del. 2012) ("[A] claim in the hands of a transferee has the same rights and disabilities as the claim had in the hands of the original claimant."); *In re Metiom, Inc.*, 301 B.R. 634, 642–43 (Bankr. S.D.N.Y. 2003) ("the established rule" is that "the assignee of a non-negotiable instrument is subject to all of the equities and burdens that attach to the property assigned, because the assignee receives no more than the assignor possessed"); *In re Dorr Pump & Mfg. Co.*, 125 F.2d 610, 611 (7th Cir. 1942) (stockholders who paid wage earners for assignments of their rights against a bankruptcy estate stood "in the shoes of the wage earners"); *Swarts v. Siegel*, 117 F. 13, 15 (8th Cir. 1902) ("[O]ne who holds the rights or claims of another by subrogation takes them subject to the limitations and disqualifications attached to them in the hands of his predecessor.").

Contrary to this well-established law, Brodski argues that the Bankruptcy Court erred in concluding that an assignment occurred between the voting unitholders and Brodski. There was no error. Brodski himself has

alleged that he bought over 12 million units from unitholders who voted to approve the Plan and its release language. (A 10 at ¶ 50). These purchases, it is alleged, occurred between December 16, 2014 and January 22, 2015, and were made at prices ranging from USD $0.18 to approximately $0.22, according to the complaint. (A 10 at ¶ 50–51).[9] Based on these allegations, the Bankruptcy Court correctly held, as a matter of law, that Brodski acquired the same rights and obligations that the previous unitholders had under the Plan and was bound by the terms of the Plan. (A 1724). To rule that someone who buys a bankruptcy claim (which is what Brodski's units represent) after plan confirmation is not bound by the terms of the bankruptcy plan would completely undermine the certainty and finality that a confirmed bankruptcy plan must provide to be effective.[10]

Brodski also illogically contends that he "plainly did not acquire" all of the voting unitholders' rights and obligations because he did not receive the initial distribution at issue in this case. But Brodski acquired only those

---

[9] At the motion to dismiss stage, the Bankruptcy Court was obligated to accept these allegations as true. *Spruill v. Gillis*, 372 F.3d 218, 223 (3d Cir. 2004).

[10] The cases Brodski relies on (App. Op. Br. at 25–26) do not compel a different conclusion because they do not address the enforceability of plan releases against entities that buy claims after plan confirmation. *See Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 55–56 (3d Cir. 2001) (evaluating whether patent infringement claims were included within the scope of an arbitration clause); *Longacre Master Fund, Ltd. v. ATS Automation Tooling Sys., Inc.*, 496 F. App'x 135, 139 (2d Cir. 2012) (analyzing the sufficiency of allegations in a breach-of-contract dispute between buyer of a bankruptcy claim and seller); *Miller v. Wells Fargo Bank Int'l Corp.*, 540 F.2d 548 (2d Cir. 1976) (addressing trustee's claim to recover, as voidable preferences, two payments made by debtor).

rights attached to the units as of the date he bought them. The right to receive the initial distribution extended only to registered unitholders on the publicly-disclosed record date under the Plan, which did not include Brodski. (A 168 at § 6.2). If Brodski believes he is entitled to receive the initial distribution, he can pursue claims against the unitholders who sold him their units.  Moreover, Brodski did acquire the right to receive future distributions, so his argument that the transferring unitholders "retain[ed] contract rights relating to the property" is wrong. (App. Op. Br. at 26 n.8). Also, when he bought the units he accepted the obligation to be bound by the terms of the releases "permanently and forever." (A 175–76 at § 9.1; A 595–96 at ¶ 29).

### 2.      The releases encompass Brodski's claims.

Brodski is also wrong to argue that the Plan release cannot apply to his claims because the voting unitholders never held those specific claims. This argument does not address the court orders that bar all claims related to payments and distributions to unitholders. Moreover, the Plan release and the nearly identical one in the Recognition Order are broad enough to cover the subject matter of Brodski's claims, which, the Bankruptcy Court correctly concluded, "are predicated on not having received the initial distribution." (A 1721). Beyond that, the releases bar any claims that "*any*

*Person* may be entitled to assert … whether known or unknown, matured or unmatured, … foreseen or unforeseen, *existing or hereinafter arising*." (A 175–76 at § 9.1 (emphasis added)). This expansive language, which was bargained for and approved (A 13 at n.4), covers all claims, including those in existence at the time the Plan was approved and those arising after the fact, made by "any Person," in connection with the Plan's distribution procedure. And it carries forward to bar the claims of not only the voting unitholders but also their "successors and assigns," including Brodski's claims. (A 161).

A broad release that shields the Arctic Parties from all liability for acts or omissions arising from Plan administration serves a proper and essential purpose: It would be illogical and exceedingly unfair to expose them to liability for carrying out the Plan. To allow Brodski to circumvent the releases and court orders based on the spurious assertion that the voting unitholders could not release Brodski's claims would eviscerate the protection that such releases are intended to provide to debtors who carry out a confirmed bankruptcy plan.[11] This Court should reject that argument.

---

[11] The case Brodski relies on to support his position is inapposite. (App. Op. Br. at 27 (citing *Medtronic*)). In *Medtronic*, the court ruled that a manufacturer that had asserted patent infringement claims against a competitor did not have to arbitrate those claims under a settlement agreement between the competitor and a third party, whose business the manufacturer had acquired while the patent cases were pending, because the patent claims had never been owned by the third party. 247 F.3d at 48.

### 3.   Sufficient notice of the Plan was provided.

Equally unconvincing is Brodski's argument that enforcing the release against him would violate his due process rights because he was not represented during the bankruptcy proceedings. In bankruptcy, claim holders have due process rights that require "notice reasonably calculated, under all circumstances, to inform interested parties of the pendency of an action and to give them an opportunity to present their objections." *Stratton v. Mariner Health Care, Inc. (In re Mariner Post-Acute Network, Inc.)*, 303 B.R. 42, 46 (Bankr. D. Del. 2003) (internal citation omitted). The record shows that Arctic provided sufficient notice.

As an initial matter, Brodski has not alleged that the due process rights of the voting unitholders were violated during the Canadian or U.S. bankruptcy proceedings. Nor could he. The voting unitholders received sufficient notice of the Plan and the release contained in the Plan. (*See* A 356–401 at ¶¶ 1.7, 5.10; A 587 at ¶ 3). The Plan was accepted by 99.81% of the unitholders who voted on it. (A 218–19). Each unitholder was "deemed to have consented and agreed to all of the provisions of the Plan in their entirety." (A 592 at ¶ 19; *see also* A 180–81 at § 11.1). And the Plan explicitly provides that it is binding not only on the voting unitholders but also on their "successors and assigns." (A 161 at § 1.3). The record shows

that the previous owners of the units currently held by Brodski received appropriate notice sufficient to satisfy due process and had ample opportunity to be heard regarding the Plan.

In addition, there is no allegation that Brodski himself did not have notice of the underlying bankruptcy proceeding or the Plan provisions. Buyers of bankruptcy claims like Brodski typically "are highly sophisticated entities fully capable of performing due diligence before any acquisition." *In re KB Toys, Inc.*, 470 B.R. at 342. That is especially true here, where Brodski was "well aware (or should have been aware) that [he was] entering a risky investment arena with lower disclosure requirements." (A 1724). As the Bankruptcy Court noted, Brodski bought his units on the OTC "Pink" market, which cautioned investors that it includes "distressed, delinquent, and dark companies not able or willing to provide adequate information to investors." (A 1724).

For these reasons, Brodski's heavy reliance on *Jones v. Chemetron Corp.*, 212 F.3d 199 (3d Cir. 2000) is misplaced.[12] In *Chemetron*, a claimant sought to recover for injuries sustained from exposure to radioactive and

---

[12] Brodski also cites two other inapposite cases—*Morgan Olson L.L.C. v. Frederico (In re Grumman Olson Indus.)*, 467 B.R. 694 (S.D.N.Y. 2012) and *In re Chance Indus.*, 367 B.R. 689 (Bankr. D. Kan. 2006). The Bankruptcy Court accurately concluded that *Morgan* and *Chance* differ from this case because (1) Arctic followed the Plan and thus violated no law and (2) the voting unitholders were present during confirmation of the Plan, and thus, as successors and assigns to those unitholders, Brodski had a relationship with Arctic at or before the time the Plan was confirmed. (A 1724–25).

other hazardous substances. *Id.* at 209. The court held that he could pursue his claims against the debtor because he was not born before the claims bar date had expired and therefore had no notice of or representation at the bankruptcy proceedings. *Id.* at 210. Unlike the unborn claimant in *Chemetron*, Brodski here bought the claims from unitholders who had notice of the insolvency proceeding and participated in it. Because Brodski simply "step[ped] into the shoes" of the selling unitholders, he was fully notified of the insolvency proceedings and his interests were fully represented. So he cannot argue that his due process rights were violated, and the Bankruptcy Court's ruling should be affirmed.

## III.   This Court should affirm on alternate grounds raised below.

Even if this Court finds that Brodski's claims are not barred by *res judicata* or the releases and court orders, the Court should still affirm based on others grounds raised below that the Bankruptcy Court did not reach.

### A.   The fraud allegations do not give rise to a strong inference of scienter.

The fraud claims were properly dismissed because there is not a single factual allegation—nor could there be—to support the conclusion that the Arctic Parties acted with the requisite scienter (intent or recklessness) necessary to sustain the claims. As the Arctic Parties argued in the motion to dismiss (*see* A 51–55), Brodski has not alleged any facts showing that the

Arctic Parties acted with an intent to deceive. Nor would any such allegations be plausible, since it is undisputed that they acted strictly in accordance with the confirmed Plan. Also, the Arctic Parties had no motive or incentive to defraud any of the unitholders, including Brodski, because the amount of money paid in the distribution was the same whether it went to Brodski or the rightful unitholders as of the record date.

Instead, the allegation of scienter rests entirely on the baseless theory that the Arctic Parties were reckless in not disclosing an ex-date and that there was no change in the market price of Arctic units after Arctic issued a press release on December 15, 2014, announcing a unitholder distribution. (*see* A 1179–80). Specifically, Brodski contended that it was "quintessential recklessness" for the Arctic Parties to not disclose that "the market was not reacting to the [December 15th] announcement in a way that made any sense" (*see* A 1179–80), but no such disclosure could have even been made because the distribution amount was not known until later, a fact that was disclosed multiple times. These allegations fall far short of satisfying the recklessness standard.[13] This provides an independent ground on which to affirm the Bankruptcy Court's dismissal of the fraud claims.

---

[13] Moreover, the record evidence affirmatively demonstrates that Appellees were not reckless: instead, they took many steps to inform the unitholders and the public about the distribution. (A 55 at ¶ 41).

**B.      Brodski failed to plead actionable misrepresentations or justifiable reliance.**

The claims for misrepresentation fail because Brodski failed to plead both actionable omissions and justifiable reliance on such omissions.

With respect to the alleged omissions, it is well-settled law that Arctic had no duty to make "soft statements" of belief about a company's compliance with the law, so Brodski's allegation that Arctic should have disclosed it was not complying with U.S. securities laws and FINRA rules (A 20 at ¶ 98(a)–(b)) cannot state a claim. *See Kushner v. Beverly Enters.*, 317 F.3d 820, 830–31; *Murphy v. Sofamor Danek Grp. (In re Sofamor Danek Grp.)*, 123 F.3d 394, 401–02 (6th Cir. 1997). Nor could Arctic have disclosed that it would unilaterally establish the ex-date, as Brodski alleges it should have (A 20 at ¶ 98(c)), because it does not have the power to do so; ex-dates are set by the stock exchange rules. (A 988–89). All Arctic had the power to do was set the record date. Finally, Brodski's claim that Arctic should have corrected its press release from December 15, 2014, after the trading price of its units allegedly did not "appropriately adjust[] downward" to reflect the contents of the release (A 20 at ¶ 98) has no merit, because nothing in the press release is alleged to be false. The duty to correct a prior statement arises only "when a company makes a historical statement that, at the time made, the company believed to be true, but as revealed by

subsequently discovered information actually was not." *Oran v. Stafford*, 226 F.3d 275, 286 (3d Cir. 2000) (internal citation omitted). None of these alleged omissions can support a claim.

With respect to justifiable reliance, Brodski's allegations rest solely on the fraud-on-the-market theory. Numerous courts have held as a matter of law, however, that the OTC market, where the Arctic units traded, is not efficient. (*See* A 73 at ¶ 83). Moreover, Brodski alleges no facts to show that the market for Arctic's units was efficient. *See generally In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 208 (E.D. Pa. 2008), *aff'd sub nom.*, 639 F.3d 623 (3d Cir. 2011) (listing ten factors relevant to pleading fraud-on-the-market); (*see also* A 20–24 at ¶¶ 101, 106–07, 110–11, 121–22). Thus, the misrepresentation claims fail because Brodski has not alleged justifiable reliance. (*See* A 74–76 at ¶¶ 85–87). This provides an independent ground on which to affirm the Bankruptcy Court's ruling.

### C.   Brodski failed to show that the Arctic Parties owed him a duty to comply with Rule 10b-17 or the FINRA Rules.

All of the negligence-based claims fail because they improperly seek to impose a duty to act contrary to the Plan and are based on the false

premise that the Arctic Parties owed Brodski a duty to comply with Rule 10b-17 of the Securities Exchange Act and FINRA rules.[14]

As the Arctic Parties argued in the motion to dismiss, they had no duty to comply with FINRA UPC Rule 11140. (A 62). Indeed, the complaint does not allege that Arctic is a member of FINRA,[15] and it is beyond dispute that FINRA rules apply only to FINRA members. (*See* A 982); *Ayco Co., L.P. v. Feldman*, No. 1:10-CV-1213, 2010 WL 4286154, at *10 (N.D.N.Y. Oct. 22, 2010) (stating that non-FINRA members are not bound to comply with FINRA rules). But even if the Arctic Parties generally had a duty to comply with FINRA rules (a point the Arctic Parties do not concede to be true), they would *not* owe that duty to Brodski. In particular, the FINRA rules on which Brodski relies to establish liability are not specifically intended to benefit unitholders like Brodski; rather, they are designed strictly for market operations. *See Gold v. Ford Motor Co.*, 937 F. Supp. 2d 526, 530–31 (D. Del. 2013).

Further, Rule 10b-17 does not require that notice be given to investors. 17 C.F.R. 240.10b-17 ("Notice shall be deemed to have been

---

[14] Brodski's claim for breach of fiduciary duty fails for the same reason—Appellees Clark, Filmon, Swaine, and Adams owed no duty to Brodski. (*See* A 56–58 at ¶¶ 43–49).

[15] A FINRA "member" is defined as "any individual, partnership, corporation or other legal entity admitted to membership in FINRA under the provisions of Articles III and IV of the FINRA By-Laws." FINRA Rule 0160(b)(9). There is no allegation, nor could there be, that Arctic has ever been "admitted to membership in FINRA" under any provision.

given in accordance with this section only if . . . [g]iven to [FINRA] . . . .").

Nor does FINRA itself provide notice to investors; it provides notices to its members. *Gold*, 937 F. Supp. 2d at 530–31. Thus, to characterize the disclosure obligations under these rules as duties owed to individual investors like Brodski would be to do something that neither Congress, the SEC, nor FINRA has done. This provides an independent ground on which to affirm the Bankruptcy Court's ruling.

## CONCLUSION

The Arctic Parties respectfully ask the Court to affirm the ruling of the Bankruptcy Court.

RLF1 15500371v.1

Dated: October 21, 2016
   Wilmington, Delaware

Respectfully submitted,

Paul N. Heath (No. 3704)
Marcos A. Ramos (No. 4450)
Brendan J. Schlauch (No. 6115)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
Email:  heath@rlf.com
Email:  ramos@rlf.com
Email:  schlauch@rlf.com
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

David Woodcock
Mark W. Rasmussen
Arielle S. Tobin
Allison L. Fuller
JONES DAY
2727 North Harwood Street
Dallas, TX 75201
Email:  dwoodcock@jonesday.com
Email:  mrasmussen@jonesday.com
Email:  atobin@jonesday.com
Email:  afuller@jonesday.com
Telephone:  (214) 220-3939
Facsimile:  (214) 969-5100

*Attorneys for Appellees*

-40-

## CERTIFICATION OF COMPLIANCE WITH RULE 8015(a)(7)(B)

This brief complies with the type-volume limitation of Rule 8015(a)(7)(B) because this brief contains 9,587 words, excluding the parts of the brief exempted by Rule 8015(a)(7)(B).

_____

Marcos A. Ramos