IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 15 |
| Arctic Glacier International, Inc., | ) |
| | ) Bank. No. 12-10605 (KG) |
| Debtors in a Foreign Proceeding. | ) |
| | ) Adv. Proc. No. 15-51732 (KG) |
| | ) |
| Eldar Brodski Zardinovsky a/k/a Eldar Brodski | ) |
| a/k/a Eldar Brodski (Zardinovsky), EB Books, Inc., | ) |
| EB Design, Inc., EB Online, Inc., EB Imports, Inc., | ) |
| Lazdar Inc., Eldar Brodski Inc., Y Capital Advisors Inc., | ) |
| Valley West Realty Inc., Ruben Brodski, Ruben | ) |
| Brodski Inc., Ester Brodski, and Yehonathan Brodski, | ) |
| | ) |
| Appellants, | ) |
| v. | ) Civ. No. 16-617 (SLR) |
| | ) |
| Arctic Glacier Income Fund, James E. Clark, | ) |
| Gary A. Filmon, David R. Swaine, and Hugh A. Adams, | ) |
| | ) |
| Appellees. | ) |

Kevin S. Mann, Esquire, of Cross & Simon, LLC, Wilmington, Delaware. Counsel for Eldar Brodski Zardinovsky a/k/a Eldar Brodski a/k/a Eldar Brodski (Zardinovsky), EB Books, Inc., EB Design, Inc., EB Online, Inc., EB Imports, Inc., Lazdar Inc., Eldar Brodski Inc., Y Capital Advisors Inc., Valley West Realty Inc., Ruben Brodski, Ruben Brodski Inc., Ester Brodski, and Yehonathan Brodski.

Paul N. Heath, Esquire, Marcos A. Ramos, Esquire, and Brendan J. Schlauch, Esquire, of Richards Layton & Finger, P.A., Wilmington, Delaware; David Woodcock, Esquire, Mark W. Rasmussen, Esquire, Arielle S. Tobin, Esquire, and Allison L. Fuller, Esquire, of Jones Day, Dallas, Texas. Counsel for Arctic Glacier Income Fund, James E. Clark, Gary A. Filmon, David R. Swaine, and Hugh A. Adams.

**MEMORANDUM OPINION**

Dated: June  /4  , 2017
Wilmington, Delaware

ROBINSON, Senior District Judge

## I. INTRODUCTION

Appellants Eldar Brodski Zardinovsky and others (collectively "plaintiffs")[1] filed this appeal on July 19, 2016. (D.I. 1) The appeal arises from an opinion and order entered by the bankruptcy court on July 13, 2016 dismissing a post-petition adversary proceeding complaint filed by plaintiffs against debtor Arctic Glacier Income Fund ("AGIF") and defendants James E. Clark, Gary A. Filmon, David R. Swaine, and Hugh A. Adams (collectively, the "individual defendants,"[2] and together with AGIF, the "defendants"). *Zardinovsky, et al. v. Arctic Glacier Income Fund, et al. (In re Arctic Glacier Int'l, Inc.)*, 2016 WL 3920855, No. 15-51732 (KG) (Bankr. D. Del. July 13, 2016).

Following confirmation of AGIF's Plan of Arrangement ("Plan") under Canada's Companies' Creditors Arrangement Act (the "CCAA"), plaintiffs purchased units in AGIF between December 16, 2014 and January 22, 2015. On January 22, 2015, pursuant to the Plan's distribution procedure, defendants made distributions to those who held units as of December 15, 2014 – in other words, to those who sold their units to plaintiffs. The complaint alleges that under U.S. securities law, defendants should have made distributions to plaintiffs, rather than to the selling unitholders.[3] Defendants moved to dismiss the complaint on the bases that: (i) various releases contained in the confirmed Plan and confirmation orders insulate defendants from liability, and (ii) under the doctrine of *res judicata,* defendants were only obligated to make distributions pursuant to the Plan, not U.S.

---

[1] EB Books, Inc., EB Design, Inc., EB Online, Inc., EB Imports, Inc., Lazdar Inc., Eldar Brodski Inc., Y Capital Advisors Inc., Valley West Realty Inc., Ruben Brodski, Ruben Brodski Inc., Ester Brodski, and Yehonathan Brodski.

[2] Individual defendants James E. Clark, Gary A. Filmon, and David R. Swaine were at all relevant times trustees of AGIF; individual defendant Hugh A. Adams was at all relevant times secretary of AGIF.

[3] "Unitholder" is the term used in the Plan (as defined herein) for shareholders.

securities law and, therefore, defendants violated no law in making the distributions. The bankruptcy court agreed with defendants and dismissed the complaint. *See Arctic*, 2016 WL 3920855, at *1. For the reasons set forth herein, the court will affirm.

## II. BACKGROUND[4]

### A. Insolvency Proceedings

AGIF was an income trust based in Canada which owned a group of companies that manufactured and distributed packaged ice.[5] AGIF was listed on the Canadian Securities Exchange ("CSE") under the symbol "AG.UN." AGIF's units traded on the U.S.-based Over-The-Counter ("OTC") market under the symbol "AGUNF." (A7, ¶ 34; A11, ¶ 55) On February 22, 2012, AGIF and its affiliates commenced insolvency proceedings in Canada under the CCAA. (A6, ¶ 26) The same day, the Canadian court appointed a monitor, and the monitor commenced ancillary proceedings in the bankruptcy court under Chapter 15 of the Bankruptcy Code. In the CCAA proceedings, under the supervision of the monitor and the Canadian court, AGIF sold substantially all of its assets, and the proceeds were sufficient to pay AGIF's secured creditors in full. (A5, ¶ 27) The remaining proceeds were held by the monitor pending determination of the amount of creditor claims and the filing of the Plan to govern distribution of the remaining proceeds to unsecured creditors and, to the extent that all creditors could be paid in full, to make distributions to AGIF's unitholders.

### B.    Plan, Sanction Order, and Recognition Order

AGIF held a meeting of unitholders to consider and vote on the Plan, and notice of the meeting was provided to all unitholders. (*See* A350-401) The Canadian court determined there had been sufficient notice of the meeting to unitholders, as well as

---

[4] The bankruptcy court set forth a detailed summary of the factual and procedural background in its memorandum opinion. *See Arctic*, 2016 WL 3920855, at *1-*14.
[5] Citations to "A__" are to the appendix filed in support of plaintiffs' opening brief (D.I. 9).

2

sufficient service of documents related to the meeting.  (A587, ¶ 3)  The Plan was approved by 99.81% of all unitholders who voted, and over 65% of unitholders voted.  (A199; A441-43)  The Plan and orders contained provisions that released defendants from liability for any actions or omissions related to, arising out of, or connected with the Plan.  Each unitholder was deemed to have consented and agreed to all provisions of the Plan, including the releases.  (A592, ¶ 19(a))  The Plan, once approved, was binding not only on unitholders but also on their "successors and assigns."  (A161, ¶ 1.3)  The Canadian court approved and sanctioned the Plan pursuant to the CCAA on September 5, 2014 (the "Sanction Order").  The plan implementation date occurred on January 22, 2015.  (A8-9, ¶¶ 39, 45; A584-604)  The Sanction Order declared that the terms of the Plan governed the conduct of AGIF and related parties as of the date of signing, and authorized them "to take all steps and actions necessary or appropriate to implement the Plan":

> [T]he Arctic Glacier Parties,[6] the Monitor and the CPS,[7] as the case may be, **are hereby authorized and directed to take all steps and actions necessary or appropriate to implement the Plan in accordance with and subject to its terms and conditions, and enter into, adopt, execute, deliver, complete, implement and consummate all of the steps, . . . distributions,** payments, deliveries, allocations, instruments, agreements and releases contemplated by, and subject to the terms and conditions of, the Plan, and all such steps and actions are hereby approved.  Further, to the extent not previously given, all necessary approvals to take such actions shall be and are hereby deemed to have been obtained from the Directors, Officers, or Trustees, as applicable . . . .

(A589-90, ¶ 12)  On September 16, 2014, the bankruptcy court entered an order (A460-66) ("Recognition Order")[8] recognizing the Sanction Order and giving "full force and effect in the

---

[6] "Arctic Glacier Parties" is defined in the Plan as including AGIF and various other entities, but not the individual defendants.  (*See* A151, § 1.1)

[7] "CPS" is defined in the Plan as "7088418 Canada Inc. o/a Grandview Advisors and any successor thereto appointed by the CCAA Court."  (A153, § 1.1)  CPS, together with the monitor, were empowered under the Sanction Order to administer and distribute available funds under the Plan.  (*See* A598, ¶ 34)

[8] The Sanction Order and the Recognition Order are referred to collectively herein as the "Orders."

United States" to its provisions.  (A462, ¶ 2)  The Recognition Order provided that "due and

sufficient notice" of both the motion seeking approval and the Sanction Order itself had

been given and that "no other or further notice need be provided."  (A461)

### C.    Distribution Procedures Under the Plan and Orders

The Plan provides detailed procedures for the distribution to unitholders.  Section 6.2

limits distributions "to each Registered Unitholder, as of the applicable Unitholder

Distribution Record Date."  (A168, § 6.2)  Section 6.2 of the Plan provided that the monitor

would declare a record date that would determine which unitholders were eligible to receive

the distribution, and that the transfer agent would pay the distribution to each registered

unitholder as of the record date.  Specifically, the Plan provided:

> The Monitor shall declare a Unitholder Distribution Record Date prior to any
> distribution . . . . On the Plan Implementation Date or on any Distribution Date, as the
> case may be, the Monitor shall transfer amounts as determined by the Monitor in
> accordance with the [Plan] . . . to the Transfer Agent . . . . [I]n no event later than five
> (5) Business Days following receipt of the Unitholder Distribution, **the Transfer
> Agent shall distribute each Unitholder Distribution . . . to each Registered
> Unitholder, as of the applicable Unitholder Distribution Record Date** . . . based
> on each Registered Unitholder's Pro Rata Share . . . .

(A168, § 6.2) (emphasis added) The Plan further provided that the unitholder distribution

record date must be "at least 21 days prior to a contemplated Unitholder Distribution . . ."

(A159, § 1.1)

Section 8.3 of the Plan provides the steps and transactions to be undertaken on the

plan implementation date:

> **The steps, transactions, settlements and releases** to be effected in the
> implementation of the [Plan] **shall occur**, and be deemed to have occurred, **in the
> following order without any further act of formality . . .**
>
> (a) the Monitor . . . shall use the Available Funds to fund the following reserves and
> distribution cash pools in the order specified below:
> > (i) Administrative Costs Reserve;
> > (ii) Insurance Deductible Reserve;
> > (iii) Unresolved Claims Reserve;
> > (iv) Affected Creditors' Distribution Cash Pool; and

> (v)  Unitholders' Distribution Cash Pool;
> and administer such reserves and distribution cash pools pursuant to and in
> accordance with the [Plan];
>
> * * *
>
> (d)  the steps, assumptions, distributions, transfers, payments, contributions,
> liquidations, dissolutions, wind-ups, reduction of capital, settlements and releases
> set out in Schedule "B" of the [Plan] shall be deemed to be completed in the order
> specified therein . . .

(A174, § 8.3) (emphasis added)  Schedule "B" to the Plan provides specific instructions as

to steps to be taken on the plan implementation date:

> In order to effect the wind-up, liquidation and dissolution of certain of the Arctic
> Glacier Parties to facilitate the satisfaction of Proven Claims and a distribution by the
> Fund to Unitholders pursuant to and in accordance with the [Plan], the following
> steps, assumptions, distributions, transfers, payments, contributions, liquidations,
> dissolutions, wind-ups, reduction of capital, settlements and releases shall be
> deemed to occur (a) immediately after the completion of the step set out in Section
> 8.3(c) of the [Plan]; (b) in the order specified in this Schedule "B"; and (c) in the
> manner specified in this Schedule "B".

(A187, Sch. B)  Schedule B of the Plan provides specific instructions as to the last step in

the distribution procedures:

> [AGIF] shall be deemed to have paid a distribution to each Unitholder in the amount
> of their Pro Rata Share of the Unitholders' Distribution Cash Pool immediately
> following the completion of Steps 1 through 29 above and such amount shall be
> transferred by the Monitor to the Transfer Agent and distributed by the Transfer
> Agent to the Unitholders in accordance with Section 6.2 of the [Plan].

(A197, Step 30)  Section 8.3 only allows for distributions "in accordance with" the Plan (*i.e.*,

§ 6.2); Schedule "B" only allows for distributions "in accordance with Section 6.2 of the . . .

Plan."  (A187)

The Sanction Order provides that distributions shall be made in accordance with the

CCAA, the Plan, and court orders, under the exclusive authority of the monitor:

> THIS COURT ORDERS AND DECLARES that, in addition to the Monitor's
> prescribed rights under the CCAA, and the powers granted by this Court to the
> Monitor and the CPS, as the case may be, the powers granted to the Monitor and
> the CPS are expanded as may be required, and the Monitor and CPS are
> empowered and authorized before, on or after the Plan Implementation Date, to take
> such additional actions and execute such documents . . . **as the Monitor and the
> CPS consider necessary or desirable** in order to perform their respective functions

and fulfill their respective obligations under the Plan, the Sanction Order and any Order of this Court in the CCAA Proceedings and to facilitate the implementation of the Plan and the completion of the CCAA Proceedings, including to . . . (ii) **administer and distribute the Available Funds**, (iii) establish, hold, administer and **distribute . . . the Unitholders' Distribution Cash Pool**, . . . (v) **effect distributions to the Transfer Agent in respect of distributions to be made to Unitholders** . . . and, in each case where the Monitor or the CPS, as the case may be, takes such actions or steps, **they shall be exclusively authorized and empowered to do so, to the exclusion of all other Persons including the Arctic Glacier Parties, and without interference from any other Person.**

(A598-99, ¶ 34 (emphasis added))  Thus, the Sanction Order empowers the monitor to administer and distribute funds to unitholders "without interference from any other Person" including the Arctic Glacier Parties.  (*Id.*)  Further, the definition of "Person" includes any "Government Authority" or any agency, regulatory body, officer or instrumentality thereof or any entity, wherever situated or domiciled."  (A157, § 1.1)  Government Authority is defined as "any government, regulatory or administrative authority . . . or other law, rule or regulation-making or enforcing entity having or purporting to have jurisdiction on behalf of any nation . . . ."  (A156, § 1.1)

### E.    U.S. Securities Laws Governing Distributions

Plaintiffs do not appear to dispute that defendants made the distribution to unitholders in accordance with the Plan.  Rather, plaintiffs contend that defendants did not comply with U.S. securities laws, which required making the distribution to plaintiffs, and this contention is central to each of the claims in the complaint.  The bankruptcy court set forth a thorough explanation of the relevant statutes and rules in its opinion,[9] the substance of which the parties do not appear to dispute.  For the purposes of this memorandum opinion, the court will briefly summarize the relevant authorities.

Rule 10b-17 of the Securities and Exchange Act of 1934 establishes an issuer's mandatory set of disclosures if it trades on the OTC market and wishes to make a

---

[9] *See Arctic*, 2016 WL 3920855, at *5-*7.

distribution.  (A11, ¶ 56)  Notice of a distribution must be given to the Financial Industry

Regulatory Authority ("FINRA")[10] no later than ten days prior to the record date of an

issuer's offer of dividends.[11]  (A11 ¶ 58; 17 C.F.R. § 240.10b-17(a) and (b)(1); *In re

THCR/LP Corp.*, 2006 WL 530148 at *4 (Bankr. D.N.J. Feb. 17, 2006)).  The SEC gave

FINRA power to regulate payment of dividends.  FINRA Rule 6490 ("Rule 6490") creates

procedures within FINRA for review and determination of the sufficiency of requests to issue

dividends.  (A12, ¶¶ 63, 66; SEC Release No. 34-62434 (July 1, 2010) at *1)

FINRA is authorized by the SEC to adopt and administer the Uniform Practice Code

("UPC"), "the rules and regulations governing [OTC] secondary market securities

transactions." *THCR/LP,* 2006 WL 530148 at *4.  The UPC sets forth a basic framework of

rules governing broker-dealers with respect to the settlement of OTC Securities and

governs how distributions by securities issuers must be allocated to the holders of

securities.  *See* SEC Release No. 62434 (July 1, 2010), n.8.  FINRA lacks privity[12] with

issuers of OTC Securities: "FINRA does not impose listing standards for securities and

---

[10] FINRA is a self-regulatory organization that regulates the OTC secondary market
pursuant to authority granted by the Securities and Exchange Commission ("SEC").  (A2, ¶
1)  It is the successor to the National Association of Securities Dealers, Inc. ("NASD").
FINRA "has the authority to determine the date on which a holder of AGIF units trading in
the United States . . . has to own such units in order to receive a dividend."  (A7, ¶ 34)
"FINRA processes requests to announce and publish certain corporate actions [including
cash dividends and distributions] from issuers whose securities are quoted on the OTC . . .
[and] publishes these announcements on the Daily List on its website."  (A7-A8, ¶¶ 35-37)
[11] This memorandum opinion will also refer to "distributions" and "dividends"
interchangeably. *See Arctic*, 2016 WL 3920855, at *1, n.3.
[12] Despite the lack of privity between FINRA and issuers, the SEC notes the following
possible consequences of an issuer failing to observe the requirements of Rule 10b-17:
> The other commenter questioned whether the proposed fees for providing Company-
> Related Action processing services might cause issuers to effect corporate actions
> without notifying FINRA.  In response to this point, FINRA noted that an issuer that
> fails to notify FINRA of a proposed corporate action, as required by Rule 10b-17 is
> potentially violating an anti-fraud rule of the federal securities laws and stated that
> where it has actual knowledge of issuer noncompliance with Rule 10b-17, FINRA will
> use its best efforts to notify the Commission.
SEC Release No. 62434 (July 1, 2010) (footnotes omitted).

maintains no formal relationship with, or direct jurisdiction over, issuers." *Id.* at *2-3.  UPC 11140 determines which unitholders are entitled to a distribution. *See* NASD Notice to Members 00-54 (August 2000).[13]  The UPC provisions determine which unitholders are entitled to a distribution by setting two dates: the "record date" and the "ex-dividend date" ("ex-date"). *See THCR/LP*, 2006 WL 530148, at *5.

The **record date** refers to "the date fixed by the . . . issuer for the purpose of determining the holders of equity securities . . . entitled to receive dividends . . . or any other distributions." *Id.* (citing UPC Rule 11120(e)).  The record date is the date on which one must be registered as a shareholder on the stock book of a company in order to receive a dividend declared by that company.  Thus, the record date determines to whom the issuer sends the distribution.  "The fact that an individual is the holder of record on the record date, however, does not necessarily mean that such person is entitled to retain the dividend." *Id.* at *6 (quoting *Limbaugh v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 732 F.2d 859, 861 (11th Cir. 1984).

"In terms of entitlement, the **ex-dividend** date is the dividing line . . . When stock is sold prior to the ex-dividend date, the right to a dividend goes with the stock to the purchaser, rather than staying with the seller." *Id.* (citations omitted) (emphasis added). When stock is sold on or after the ex-date, it is "traded without a specific dividend or distribution."[14]  (A14-15, ¶ 70; UPC Rule 11120(c); *THCR/LP Corp.*, 2006 WL 530148 at *5) The ex-date can only be set by FINRA and determines which unitholder is ultimately entitled to the distribution. *THCR/LP*, 2006 WL 530148 at *5.  "Taken together, these two dates

---

[13] For convenience, Rule 10b-17, Rule 6490, SEC Release No. 62434, UPC 11140, and NASD Notice to Members 00-54 are referred to hereinafter as the "FINRA Rules."
[14] Thus, the ex-date also determines the date when the price of the security is adjusted downward to reflect loss of the right to the distribution. *See* NASD Notice to Members 00-54 at *1.

delimit the timeframe during which a security, when sold, carries with it from the seller to the buyer the right to receive a distribution." *Id.*; UPC 11140.

The ex-date generally precedes the record date, in which case the stockholder legally entitled to the dividend is the individual to whom the dividend is sent. *THCR/LP*, 2006 WL 530148, at *6. On the other hand, if the record date precedes the ex-date, and the security is sold during the period between the two, the seller of the security (who held the security on the record date) will receive the full, unadjusted price for the security, as well as the distribution. However, the purchaser of the security – who is the holder on the ex-date – will be legally entitled to the distribution. Under such circumstances, the seller will be obligated to remit the value of the dividend to the buyer. *See e.g., Silco, Inc. v. United States*, 779 F.2d 282, 284 (5th Cir. 1986).

The FINRA Rules and the Plan's distribution procedures differ in two important respects relevant to the appeal. First, with respect to notification requirements, the Plan and orders make no mention of any obligations to notify FINRA, or to otherwise observe any authority beyond the CCAA and the Plan. (A168, § 6.2; A598, ¶ 34) Indeed, under the Sanction Order, compliance with any outside authority falls within the monitor's discretion, and defendants and the monitor are released from liability for disregard of such authority. (*See* A598, ¶ 34; A601, ¶ 40) The FINRA Rules, on the other hand, require that the issuer notify FINRA ten days prior to the record date, and "further advise FINRA of, *inter alia*, the date and amount of the dividend payment, and obtain FINRA's approval." (A14, ¶ 69; Rule 10b-17; Rule 6490)

Second, under the FINRA Rules, the size of the distribution may lead to a different allocation. A dividend payment of 24% or less of the value of the subject security will invoke UPC 11140(b)(1), which provides that "the date designated as the 'ex dividend' date shall be the second business day preceding the record date if the record date falls on a business

day, or the third business day preceding the record date if the record date falls on a day designated by the Committee as a non-delivery date." UPC 11140(b)(1). Where the dividend is 25% or greater of the value of the subject security, UPC 11140(b)(2) applies, requiring that "the ex-dividend date shall be the first business day following the payable date." UPC 11140(b)(2).

### F.   Distributions Made Under the Plan

On November 18, 2014, the monitor issued a report[15] disclosing an "Estimated Unitholders' Distributed Cash on the Plan Implementation Date" of approximately USD $0.153 per share. (A6, ¶ 30) The report predicted a plan implementation date around January 8, 2015. (*Id.*) On December 11, 2014, AGIF published legal notices in the *Wall Street Journal*, the *Winnipeg Free Press*, and the *Globe & Mail*, announcing that the unitholder distribution record date would be December 18, 2014. (A553, A555, A557) On December 15, 2014, AGIF issued a press release announcing that "unitholders of the Fund as of December 18, 2014 will be entitled to receive the initial distribution from the Fund pursuant to the [Plan]," but adding that the distribution amount had not yet been established. (A6, ¶ 31) AGIF posted the press release, as well as a material change report, on SEDAR:[16]

> [AGIF] (the "Fund") announced on December 11, 2014 that unitholders of the Fund as of December 18, 2014 will be entitled to receive the initial distribution from the Fund pursuant to the Plan of Compromise or Arrangement . . . approved by the unitholders on August 11, 2014 (the "Plan"). The date and value of this distribution will be announced by way of a press release once such information is determined.

(A563) Due to the three-day processing period for securities sales, only purchasers on or before December 15, 2014, would have been registered unitholders as of the December 18,

---

[15] The monitor issued periodic reports for purposes of public disclosure regarding AGIF. (A6, ¶ 29)

[16] SEDAR is the electronic filing system for the disclosure documents of public companies and investment funds across Canada.

2014 record date.  (A6-7, ¶ 32)  AGIF did not notify FINRA of its planned dividend.  As a result, FINRA did not set an ex-date for AGIF units.  (A7, ¶¶ 33-34)

Beginning on December 16, 2014, plaintiffs began purchasing AGIF units on the OTC market from the selling unitholders who had acquired their shares prior to confirmation of the Plan.  (A10, ¶ 50; A1400-02, ¶¶ 18-19)  Plaintiffs continued to purchase units up to and including January 22, 2015.  (A10-11, ¶¶ 50-55)  The complaint does not allege that plaintiffs were unaware of AGIF's public disclosures.  (A1-25; A39, ¶ 5)

On January 9, 2015, another press release announced that AGIF would implement the Plan as soon as possible:

> As previously announced by the Fund on December 15, 2014, the date and value of the initial distribution to unitholders of the Fund, as contemplated in the Plan, will be announced by way of a press release once such information is determined.

(A569)  AGIF issued yet another press release on January 21, 2015, disclosing that the plan implementation date would be the next day, January 22, 2015, and that "unitholders of the Fund as of December 18, 2014 (the 'Record Date') were entitled to receive an initial distribution from the Fund pursuant to the Plan of $0.155570 USD per unit of the Fund held on the Record Date."  (A44, ¶ 16; A571)

On January 22, 2015, AGIF distributed through a transfer agent $0.155570 USD per unit to the unitholders of record as of December 18, 2014.  (A8, ¶¶ 39-40)  At this time, AGIF units were trading at approximately $0.20 per unit.  (*Id.*, ¶ 40)  AGIF did not notify FINRA of the January 22 payable date.  (*Id.*, ¶ 39)  Given the three-day processing delay, plaintiffs allege that the de facto and unofficial ex-date for the dividend was December 16, 2014 – the day after the last day on which a holder would have had to purchase units in order to receive the dividend.  (A6-7, ¶¶ 32-34; A8-9, ¶¶ 41-42)  As plaintiffs began purchasing units on December 16, 2014, they did not receive the dividend.  (A10, ¶¶ 47, 49-50)

On January 23, 2015, the Investment Industry Regulatory Organization of Canada ("IIROC") imposed a "trading halt" on AGIF units trading on the CSE, listing the reason for the halt as "Pending Company Contact." (A574)  FINRA also halted trading of AGIF units on the OTC market, citing Halt Code "U1," which refers to "Foreign Regulatory Halt." (A579)  IIROC and FINRA lifted the trading halts on January 28, 2015. (A9, ¶ 44)  When trading resumed, the average unit price decreased by 75%, from a closing price of approximately $0.21 per unit on January 22, 2015, to $0.05 per unit. (A9, ¶ 45)  The decrease in unit price reflected the loss of the right to a dividend. (*Id.*)

### G.    The Adversary Proceeding

On October 30, 2015, plaintiffs initiated the adversary proceeding by filing the complaint.[17]  Plaintiffs assert that defendants "may pay dividends only with the approval of [FINRA] . . . and then only to holders of the securities that FINRA recognizes as having a right to receive the dividend in accordance with FINRA's rules." (A2, ¶ 1)  According to plaintiffs, because the distributions were greater than 75% of the value of the security, UPC 11140(b)(2) applied, and plaintiffs were entitled to the dividend because they held units on the payable date (January 22, 2015), the day before the ex-date. (A10, ¶ 52)  "[I]nstead of paying [p]laintiffs the almost $2 million in dividends they were entitled to receive, [defendants] paid the dividends to the parties who sold the units of AGIF to [p]laintiffs." (A2, ¶ 1)  Plaintiffs allege that "Defendants violated securities rules and regulations by failing to disclose material information relating to AGIF's decision to pay dividends that caused the price of AGIF units to be wrongfully inflated by approximately 75% . . . resulting in steep losses to [p]laintiffs." (A2, ¶ 2)  Plaintiffs further allege that individual defendant Adams, AGIF's Secretary, admitted in a telephone conversation on or about March 5, 2015, that "he

---

[17] *See Zardinovsky, et al. v. Arctic Glacier Income Fund, et al.*, Adv. No. 15-51732 (KG) (Bankr. D. Del.).  (A1-25)

had observed after the issuance of the [December 15, 2014] Press Release that there was no change in the market price of AGIF units," that the press release "should have caused the share price to have fallen by 75% on December 16, 2014, the first day units supposedly began to trade without the right to receive the dividend," and "that despite this awareness . . . [d]efendants affirmatively decided not to take any corrective." (A16-17, ¶¶ 77-78) The complaint asserts six causes of action, including:

> **Counts I and II** – Common law negligence claims against all defendants based on (i) alleged breach of their duty under the FINRA Rules to pay dividends to plaintiffs; and (ii) alleged breach of their duty "to comply with all relevant statutes, rules, regulations, authorities and agreements concerning the establishment of the ex-date" in connection with the distribution. (A18-19, ¶¶ 85, 86, 89, 90)

> **Count III** – Breach of fiduciary duty against the individual defendants based on their alleged failure "to ensure that dividend payments intended for unitholders were paid to [p]laintiffs" as required by the FINRA Rules. (A19, ¶ 93)

> **Count IV** – Negligent misrepresentation against AGIF based on alleged failure "to disclose material information" related to the distribution, including: (i) that AGIF would disregard the FINRA Rules, (ii) that AGIF would "unilaterally establish the ex-date without the review and approval of a regulator or exchange," and (iii) that "the trading price of AGIF's stock had not appropriately adjusted downward to reflect" AGIF's decision to announce a record date but not an ex-date under the FINRA Rules. (A20, ¶¶ 97-98)

> **Count V** – Violation of FINRA Rules against AGIF for its alleged failure to disclose material facts including: its disregard of FINRA Rules, its unilateral establishment of the ex-date, and the fact that stock did not appropriately adjust downward after the unitholder distribution record date had passed. (A21, ¶¶ 104-107)

> **Count VI** – Common law fraud against AGIF for its alleged failure to comply with the FINRA Rules and to fully disclose the same material information mentioned above with regard to the claims for negligent misrepresentation and violation FINRA Rules. (A22-24, ¶¶ 114-123)

Plaintiffs seek compensatory damages on all counts, reasonable attorney fees and costs, prejudgment interest, punitive and treble damages, and the Plan distribution. (A24)

On January 21, 2016, defendants moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). (A33-77) Following the completion of briefing (A1135-81; A1388-1412) and oral argument (*see* D.I. 15-3), the bankruptcy court dismissed the

complaint on two separate grounds: (i) the Plan's distribution procedure is a final adjudication that supersedes any conflicting obligations that plaintiffs seek to impose through the asserted claims; and (ii) the releases contained in the Plan and Orders barred plaintiffs' claims. *See Arctic*, 2016 WL 3920855 at \*15-\*21. On July 19, 2016, plaintiffs filed this appeal. (A1730)

## III. STANDARDS OF REVIEW

The court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a)(1), which provides for appeals of "final judgments orders, and decrees" of the bankruptcy court. 28 U.S.C. § 158(a)(1). The bankruptcy court's dismissal of the adversary proceeding is a final order. (A728-29) When reviewing an order, judgment, or decree on appeal from a bankruptcy court, the appellate court reviews the bankruptcy court's legal determinations *de novo*, its factual findings for clear error, and its exercise of discretion for abuse thereof. *See In re United Healthcare Systems Inc.*, 396 F.3d 247, 249 (3d Cir. 2005). Where an issue involves mixed questions of law and fact, the appropriate standard is either plenary review or utilization of a mixed standard. *See The Hertz Corp. v. ANC Rental Corp. (In re ANC Rental Corp.)*, 280 B.R. 808, 814 (D. Del. 2002), *aff'd In re ANC Rental Corp.*, 57 Fed. Appx. 912 (3d Cir. 2003).

## IV. ISSUES RAISED ON APPEAL

Plaintiffs assert the following issues on appeal: (i) whether the bankruptcy court erred in holding that the doctrine of *res judicata* bars plaintiffs' claims, even though the Plan and Orders did not address the legal obligations on which they base their claims; (ii) whether the bankruptcy court erred in holding that the doctrine of *res judicata* bars plaintiffs' claims, even though the violations of law on which plaintiffs base their claims post-dated the Plan and Orders; and (iii) whether the bankruptcy court erred in holding that the releases contained in the Plan and Orders bar plaintiffs' claims, even though enforcement of the

14

releases would violate the Due Process Clause of the U.S. Constitution.  (D.I. 8 at 3)

## V.  DISCUSSION

### A.    The Plan and Orders Preclude Plaintiffs' Claims

#### 1.    Doctrine of *Res Judicata* bars plaintiffs' claims

In opposition to the motion to dismiss, plaintiffs did not dispute that, as a matter of

law, defendants were required, under both U.S. and Canadian law, to comply with every

aspect of the Plan, including making distributions to unitholders in accordance with the

Plan.[18]  Nor do the parties dispute that defendants in fact made distributions in accordance

with the Plan's procedures.  (*See* A1157, ¶ 51 (arguing plaintiffs "do not to hold [d]efendants

liable because of any acts **in accordance with** the Plan and Recognition Order") (emphasis

in original))  Rather, plaintiffs argued that defendants had "concurrent and additional

obligations" not addressed by the Plan with respect to making the distributions, including

taking steps to comply with FINRA requirements, and that defendants' failure to comply with

those additional obligations predicated the claims in the complaint.  Because the Plan

neither address the alleged concurrent and additional FINRA compliance obligations nor

posed any conflict, plaintiffs argued that the Plan did not preclude their claims.  (*See id.*)

The bankruptcy court rejected this argument, determining "the Plan's distribution

procedure is an adjudication, and to the extent that there is a conflict between that

adjudication and the FINRA Rules, the Plan will supersede."  *Arctic*, 2016 WL 3920855 at

*15.  Because plaintiffs' claims sought to impose additional duties on defendants based

upon FINRA Rules, the bankruptcy court determined plaintiffs' claims must be dismissed.

*See id.* at *16-*17.  The bankruptcy court concluded that the imposition of any such

---

[18] *See* 11 U.S.C. § 1142 (debtor "shall carry out the plan and shall comply with any orders of the court"); A974-76 (debtor must "generally do all such acts and things in relation to [its] property and the distribution of the proceeds among [its ] creditors as may be . . . directed by the court by any special order.").

additional obligations would conflict with the Plan, which provided "one, and only one" procedure for making distributions. *See id.* "In other words, when faced with conflicting obligations under the Plan and the FINRA Rules, [d]efendants must follow the former, notwithstanding the latter." *Id.*

Plaintiffs continue to argue on appeal that defendants failed to comply with additional obligations outside of the Plan's distribution procedures which included disclosures under the FINRA Rules. (*See* D.I. 8 at 20-21) Plaintiffs argue that there was "nothing in the Plan that eliminated [defendants'] common law and statutory obligations to make" the FINRA disclosures, nor did the Plan establish a "comprehensive scheme delineating exactly what information [defendants] were and were not required to disclose to potential investors," thus the Plan did not preclude the disclosure obligations. (*Id.* at 22) Conversely, defendants argue that the Plan established an exclusive procedure for distributions and that the bankruptcy court reached the correct conclusion under well settled case law that plaintiffs claims were precluded by the Orders under the doctrine of *res judiciata*. (*See* D.I. 10 at 17)

*Res judicata* "gives dispositive effect to a prior judgment if a particular issue, although not litigated, could have been raised in the earlier proceedings." *Bd. of Trs. of Trucking Emps. of N.J. Welfare Fund, Inc. v. Centra*, 983 F.2d 495, 504 (3d Cir. 1992). This equitable doctrine requires: "(1) a final judgment on the merits in a prior suit involving (2) the same parties or their privities; and (3) a subsequent suit based on the same cause of action." *Id.* (citations omitted). For claim preclusion purposes, a plan confirmation order is a final order on the merits. *In re Bowen*, 174 B.R. 840, 846 (Bankr. S.D. Ga. 1994) ("An order confirming a plan of reorganization possesses all the requisite elements of common law *res judicata*.")

The court agrees the Plan sets forth an exclusive procedure for distribution to unitholders in section 6.2 (A168), and it is a final order on the merits. *See E. Minerals &*

16

*Chem. Co. v. Mahan*, 225 F.3d 330, 334 (3d Cir. 2000). To the extent plaintiffs assert that defendants failed to satisfy their obligations under the Plan, the Plan imposed no obligations on defendants to comply with FINRA Rules or any authority outside the CCAA and court orders. *In re Howe*, 913 F.2d 1138, 1143 (5th Cir. 1990) (stating it is "well settled that a plan is binding upon all parties once it is confirmed and that all questions that could have been raised pertaining to such plan are *res judicata*"). To the extent plaintiffs assert that the Plan's distribution procedure omitted important procedures under the FINRA Rules, which defendants were required to undertake, plaintiffs are barred from re-litigating any aspect of the Plan, including its distribution procedures. *In re Szostek*, 886 F.2d 1405, 1408, 1413 (3d Cir. 1989) (confirmed plan is *res judicata* as to all issues decided or which could have been decided at the hearing on confirmation); 11 U.S.C. § 1127. To the extent plaintiffs assert that the Plan's distribution procedures conflicted with FINRA Rules, directing distributions to the wrong unitholders, the Plan must supersede. *See Bowen*, 174 B.R. at 847 ("the binding effect of a confirmed plan of reorganization is such that *res judicata* applies even when the plan contains provisions that are arguably contrary to applicable law . . . [c]onsequently, challenges to a confirmed plan of reorganization which allege that the plan is contrary to applicable law, either bankruptcy or otherwise, are bound to be unsuccessful."); *Karathansis v. THCR/LP Corp.,* 2007 WL 1234975, *5 n.18 (D.N.J. Apr. 25, 2007), *aff'd* 298 Fed. App'x 120 (3d Cir. 2008) (prior decision interpreting "UPC 11140 as to trump the confirmed plan constitutes an errant conclusion of law"). The bankruptcy court correctly concluded that the *res judicata* effect of the Plan and Orders preclude plaintiffs' claims.

Plaintiffs further argue that, in reaching the conclusion that their claims are barred under the doctrine of *res judicata*, the bankruptcy court overlooked a critical fact: all events on which plaintiffs base their claims occurred after the confirmation of the Plan. (*See* D.I. 8

17

at 15)  According to plaintiffs, "it is well settled law that the doctrine of *res judicata* is inapplicable to claims based on post-confirmation acts" and, therefore, the Plan and Orders could not have addressed or resolved plaintiffs' claims.  (*Id.*; D.I. 16 at 2-3)  Plaintiffs cite *Donaldson* and *J&K Adrian Bakery* in support, but both cases are factually distinguishable and involved unrelated post-confirmation wrongful conduct.

In *Donaldson,* the bankruptcy court approved a chapter 11 plan requiring two principals of a corporation, who were its sole officers and shareholders, to guarantee payments to taxing authorities for which they were personally liable, along with partial payments on account of unsecured claims.  *See Donaldson v. Bernstein*, 104 F.3d 547, 554 (3d Cir. 1997).  After paying the tax obligations, the reorganized debtor failed to make remaining payments as required by the plan, claiming that adverse business conditions caused it to miss its payments.  Thereafter, the chapter 11 case was reopened and converted to chapter 7.  *See id.* at 551.  The chapter 7 trustee filed an action against defendants alleging that they obtained confirmation of the plan under false pretenses, knowing they would not fund the plan after payment of the tax debts for which they were personally liable, and seeking damages on the basis of post-confirmation breach of fiduciary duty for allegedly having diverted business opportunities and funds from the reorganized debtor to a separate company they owned and controlled.  The *Donaldson* court determined that the action was not barred by the doctrine of *res judicata* because "claims for post-confirmation acts are not barred by the *res judicata* effect of the confirmation order."  *Id.* at 555.  Unlike this case, however, defendants in *Donaldson* failed to comply with the terms of the chapter 11 plan.  *See id.* ("[t]he gravamen of the trustee's complaint is that [defendants] breached their fiduciary duty after plan confirmation by failing to comply with [the plan] and by diverting [debtor's] business opportunities).

In *J&K Adrian Bakery,* the court considered whether to dismiss a complaint asserting

18

claims relating to a chapter 11 debtor's alleged damage to property it occupied under a commercial lease. ˙See *J&K Adrian Bakery, LLC v. Dayton Superior Corp. (In re Dayton Superior Corp.)*, 2013 WL 153744, *1 (Bankr. D. Del. Jan. 15, 2013). The debtor confirmed a chapter 11 plan in October 2009, which required rejection damages claims to be filed within 30 days of the date debtor vacated the leased premises. *Id.* In November 2009, plaintiff filed a rejection damages claim. *Id.* at *2. In August 2010, following negotiations, the bankruptcy court entered a stipulated order resolving the amount of plaintiff's rejection damages claim. *Id.* However, debtor failed to vacate the property until January 2011, during which period the property damage occurred. *Id.* While the confirmation order barred all claims not filed within a specified period "unless otherwise ordered by this court," the court permitted the action for post-confirmation property damage to go forward based upon, *inter alia*, (i) the court's authority to "otherwise order" under the express language of the confirmation order, and (ii) the court's analysis of equitable considerations. *Id.* at *5.

The doctrine of *res judicata* is meant to give dispositive effect to a prior judgment of a particular issue, which although not litigated could have been raised in the earlier proceedings. (*See id.*) Here, the distribution procedure issues were addressed before Plan confirmation and entry of the Orders. Upon confirmation, the Plan's distribution procedure became a final judgment that was binding on all parties and cannot be re-litigated. The cases cited by plaintiffs involve different facts and do not require a different result.

### 2.    Plaintiffs offer no way to harmonize conflicting obligations under the Plan and FINRA Rules

Plaintiffs further argue on appeal that the bankruptcy court erred in ruling that the Plan must supersede the FINRA Rules because there is no conflict between the two. (*See* D.I. 8 at 16-20) According to plaintiffs, the Plan and FINRA Rules address the same post-confirmation issue – dividend distributions – and the bankruptcy court was required to

harmonize them under the Third Circuit's ruling in *Karathansis*. (*See id.* at 12)  The

bankruptcy court considered whether the Plan's distribution procedures could be

harmonized with FINRA Rules under plaintiffs' suggested approaches and concluded they

could not be harmonized. *See Arctic*, 2016 WL 3920855 at *15-*17.  Plaintiffs argue this

holding was in error because nothing in the Plan precluded compliance with FINRA Rules,

and defendants could have sought FINRA approval and paid the dividend in accordance

with FINRA Rules under two different approaches.  First, plaintiffs argue that distribution in

separate "tranches" was permissible under the Plan and would have enabled compliance

with FINRA. (*See id.* at 16-17)  Plaintiffs further argue that defendants could have made

distributions to both the selling unitholders under the Plan **and** to plaintiffs under the FINRA

Rules. (*See id.* at 19)  Despite the fact that some distributions would have been made

twice, plaintiffs argue this was not only permissible under the Plan but also required under

Third Circuit law.  Because compliance with FINRA Rules would conflict with the terms of

the Plan and Orders, the court finds no error in the bankruptcy court's conclusion that the

two cannot be harmonized and the Plan must supersede.

### a.    Requiring payment in tranches would conflict with the Plan

Defendants' dividend payment amounted to approximately 75% of the value of the

subject security.  (A8, ¶ 40)  In opposition to the motion to dismiss, plaintiffs argued that

defendants could have made distributions in "tranches" or separate, smaller distributions

(*e.g.*, 24%, 24%, and 3%) without running afoul of the FINRA Rules. (*See* D.I. 15, 4/19/16

Hr'g. Tr. at 48:7-14; 80:9-13)  A dividend payment of 24% of the value of the subject

security would have invoked UPC 11140(b)(1), rather than UPC 11140(b)(2).  Subsection

(b)(1), which applies to smaller dividends, provides that "the date designated as the 'ex

dividend' date shall be the second business day preceding the record date . . ." UPC

11140(b)(1).  As the bankruptcy court observed, the procedure defendants followed when

20

announcing and distributing dividends in December 2014 through January 2015 was consistent with both subsection (b)(1) of UPC 11140 and the Plan:

> On Monday, December 15, 2014, [d]efendants announced that Thursday, December 18, 2014, would be the Unitholder Distribution Record Date. Given that the OTC sale process takes three days, the de facto ex-date thus became Tuesday, December 16, 2014, i.e., this was the date as of which a new security holder would not be entitled to the dividend. UPC 11140(b)(1) also selects December 16 as the ex-date because it is exactly two days before the December 18 Unitholder Distribution Record Date. As the actual dividend distribution occurred on January 22, 2015, the procedure followed by AGIF was also consistent with the Plan, which requires that "the Transfer Agent shall distribute each Unitholder Distribution . . . to each Registered Unitholder, as of the applicable Unitholder Distribution Record Date," [which must be] "at least 21 days prior to a contemplated Unitholder Distribution."

*Arctic*, 2016 WL 3920855 at *15 (internal citations and footnotes omitted). Thus, as the bankruptcy court determined, for distributions of 24% or less, there is no conflict between UPC 11140(b)(1) and the Plan's distribution procedures, as both allocate the distribution to the same unitholders. However, where, as here, the dividend is 25% or greater of the value of the subject security, UPC 11140(b)(2) applies, requiring that "the ex-dividend date shall be the first business day following the payable date." UPC 11140(b)(2). Under subsection (b)(2), the ex-date would be January 23, 2015, the day **after** the payable date of January 22, 3015, whereas the Plan required that the unitholder distribution record date – "the dividing line between recipients and non-recipients of the distribution" – occur at least 21 days **before** the payable date. Thus, for larger dividends, such as the dividend at issue, here, the FINRA Rules plainly conflict with the Plan's distribution procedures. *Arctic*, 2016 WL 3920855 at *15-*16.

In opposition to the motion to dismiss, plaintiffs argued that distribution via multiple smaller tranches was both permissible under the Plan and would have harmonized the Plan with FINRA Rules. (*See* D.I. 15, 4/19/16 Hr'g. Tr. at 48:7-14; 80:9-13) The bankruptcy court could not reconcile plaintiffs' suggestion with the Plan for several reasons. First, the

21

tranches proposal "places a limitation on the Plan's dividend procedure" whereas "the Plan makes no distinction between small and large dividends" and "[i]ts procedure is clearly intended to apply to any dividend, of whatever size." *Arctic*, 2016 WL 3920855 at *16. Moreover, the bankruptcy court concluded that "[t]o impose on the Plan FINRA's distinction between small and large dividends is to conclude that the Plan is not comprehensive as to its distribution procedure, even though it indicates that it is." *Id.* To do so also would have "limit[ed] the Monitor's discretion in making distributions, contrary to the Sanction Order's prohibition of such limitations," thus the bankruptcy court concluded that plaintiffs' tranches proposal did not offer a way to harmonize the Plan. *Id.*

On appeal, plaintiffs argue that there was no basis for the bankruptcy court to conclude that the Plan was comprehensive, as it does not set forth the number of dividend payments, the amounts of the payments, the currency in which payments must be made, or what was to occur during the period between Plan confirmation and the distribution to unitholders. (*See* D.I. 8 at 18) Plaintiffs further argue that the Sanction Order did not "prohibit limitations" on the monitor's discretion – rather, the bankruptcy court inferred this – and with respect to post-confirmation events, all inferences should be drawn in favor of interpreting a bankruptcy Plan in a manner consistent with statutes and regulations. (*See id.* at 17-18). Conversely, defendants argue that the Plan does not allow for the monitor to modify the amount or timing of distributions, and the bankruptcy court properly held that the Plan presented "one, and only one" path for making distributions. (*See* D.I. 10 at 19)

The court agrees that the Plan permits no limitation on the monitor's discretion, is comprehensive as to its distribution procedure, and does not include a procedure for separate distributions. In accordance with the Sanction Order, the monitor is obligated only to follow the CCAA, the Plan, and the Orders. (A598, ¶ 34 (the monitor or CPS "shall be exclusively authorized and empowered to [make distributions], to the exclusion of all other

22

Persons, including the Arctic Glacier Parties, and without interference from any other Person.")) As the bankruptcy court notes, where the Plan imposes applicable law requirements, it does so explicitly. *Arctic*, 2016 WL 3920855 at *16 (citing Plan at A170-72, §§ 6.10(a), 6.10(b), 6.11, 6.13). The Plan does not subject the monitor to any applicable law requirements in discharging its obligations under the distribution procedures set forth in section 6.2. (A168) The Plan is also comprehensive. Section 8.3 and Schedule "B" of the Plan provide a sequence of steps that must begin on the plan implementation date – the date on which funds are transferred to pay unitholder distributions. (*See* A157, §1.1; A168, § 6.2 (setting forth distribution procedure); A187-A197, Sch. B (listing 29 separate steps for distribution) The Plan's distribution procedure plainly does not contemplate distribution in separate tranches. The Plan requires the monitor to "transfer amounts as determined by the Monitor in accordance with the [Plan] . . . from the Unitholders' Distribution Cash Pool . . . to the Transfer Agent." (A167-68, §§ 2.6, 6.2) The unitholders' distribution cash pool is defined as "an amount equal to the Available Funds less the amounts used to fund the: (a) Administrative Cost Reserve; (b) Insurance Deductible Reserve; (c) Unresolved Claims Reserve; and (d) Affected Creditors' Distribution Cash Pool." (*Id.*) These provisions are a mathematical formula with which the monitor was required to comply in order to make the distribution. The explicit language of the Plan permits no modification with respect to either the amount or timing of a distribution. The cases cited by plaintiffs do not require a different conclusion.[19]

_____

[19] Of the cases cited by plaintiffs that required application of a provision of a confirmed bankruptcy plan, all are distinguishable. The only such case cited within this circuit is *Sunbeam-Oster Co. v. Lincoln Liberty*, 145 B.R. 823 (W.D. Pa. 1992). In that case, the court considered whether the bankruptcy court had erred in awarding interest on an allowed claim where the confirmed plan was silent on the issue. Other cases cited by plaintiffs required the court to determine whether the confirmed plan conflicted with another court order, not FINRA rules. *See Dana Corp. v. Fireman's Fund Ins. Co.*, 169 F. Supp. 2d 744 (N.D. Ohio 1999); *In re Diaz*, 459 B.R. 86 (Bankr. C.D. Cal. 2011). In *Miller v. U.S. (In re*

23

### b.   Requiring separate distributions to plaintiffs would violate Plan

In opposition to dismissal, plaintiffs argue that a second way to harmonize the Plan with FINRA Rules was to require distributions under both the Plan and FINRA Rules, even if that results in paying some dividends twice – once to the selling unitholders and once to plaintiffs – and cited the *Karathansis* case in support. (*See* A1158-59, ¶¶ 57-60) The bankruptcy court rejected plaintiffs' argument, concluding that a separate distribution to plaintiffs would violate the Plan and Orders. *See Arctic*, 2016 WL 3920855 at *17. The bankruptcy court observed that paying twice would violate the Sanction Order "by impos[ing] an obligation on the Monitor that the Monitor did not choose." (*Id.* (citing Sanction Order ¶ 34)) Moreover, "[i]t would constitute an additional step in the Plan's distribution procedure, something the Plan does not allow." (*Id.* (citing A174, ¶ 8.3; A187, Sch. B))

On appeal, plaintiffs argue that, under *Karathansis,* the bankruptcy court was required, but failed, to harmonize the Plan with the FINRA Rules which would require distribution to plaintiffs. (*See* D.I. 8 at 13) Although this would result in making some distributions twice, plaintiffs argue that this was the solution reached in the *Karathansis* case, which was affirmed by the Third Circuit and is binding authority. (*See id.*) According

---

*Miller*), 284 B.R. 121 (N.D. Cal. 2002), the court was required to address an ambiguous plan provision and interpreted the provision in accordance with the Bankruptcy Code.

Neither *Holywell Corp. v. Smith*, 503 U.S. 47 (1993), nor *Ohio v. Kovacs*, 469 U.S. 274 (1985), involved the application of any provision of a confirmed plan. In *Holywell*, the trustee of the estate was required to file tax returns as the assignee of property of the estate despite the fact that the plan was silent about the payment of income tax. *See Holywell*, 503 U.S. at 47. In *Kovacs*, the state filed a complaint seeking a declaration that debtor's obligation to clean up a waste disposal site was not dischargeable in bankruptcy, and the Supreme Court held that the obligation was a "debt" or "liability on a claim" subject to discharge. *See Kovacs*, 469 U.S. at 274. Plaintiffs cite the following statement by the court: "[W]e do not question that anyone in possession of the site – whether it is [the debtor] or another . . . – must comply with the environmental laws of the State of Ohio" (D.I. 8 at 14), but it is unclear how this case supports plaintiffs' position.

to plaintiffs, neither the bankruptcy court nor the defendants identified any substantive difference between AGIF's Plan and the bankruptcy plan at issue in *Karathansis,* and the bankruptcy court distinguished that case without any basis for doing so. (*See id.* at 19; D.I. 16 at 9).

Conversely, defendants argue that plaintiffs' proposal would "harm the unitholders who did not trade their units by reducing later distributions" and "subject [defendants] to liability for not following the Plan from unitholders who did not receive their pro rata share." (D.I. 10 at 22-23) Defendants assert that an express purpose of the Plan was "to provide for the distribution of any surplus of the Available Funds to each Unitholder in the amount of their Pro Rata Share." (*See* A162, § 2.1(c)) The term "Pro Rata Share" is defined in the Plan as "the percentage that the Trust Units held by a Unitholder at the applicable Unitholder Distribution Record Date bears to the aggregate of all Trust Units, calculated as at the applicable Unitholder Distribution Record Date." (A157, § 1.1) According to defendants, "[p]aying a distribution twice would violate these provisions because each unitholder then would not receive its pro rata share as of the applicable record date," which would necessarily subject defendants to liability for failure to comply with the Plan. (See D.I. 10 at 23) Defendants further argue that plaintiffs have misconstrued the holding of *Karathansis*, which they contend did not require the Plan and FINRA Rules to be harmonized and did not suggest that defendants were obligated to follow the FINRA Rules. (*See* D.I. 10 at 21)

In *Karathansis*, former shareholders claimed they were entitled to receive a distribution under a bankruptcy plan because they held shares on the record date established by the plan, even though they sold their shares before the effective date of the plan. *See Karathansis*, 2007 WL 1234975 at *1. The debtors disagreed, arguing that under UPC 11140 (the same rule plaintiffs rely on here), distributions must be paid to subsequent

25

purchasers, and not to the holders as of the record date (as required by the plan). *See id.* at *4. The bankruptcy court in that case ruled that the FINRA Rules trumped the plan and that the dividend should be distributed to the purchasing shareholders. *See id.* On appeal, the district court reversed the bankruptcy court's ruling, holding that (1) the FINRA Rules did not supersede the plan, and (2) the plan allocated the dividend to selling shareholders and thus the selling shareholders should be paid the dividend. *See id.* at *8. *Karathansis* therefore supports the bankruptcy court's ruling that defendants were obligated to make distributions in accordance with the Plan, notwithstanding the FINRA Rules.

Plaintiffs argue that this reading of the *Karathansis* decision is "incomplete" and that it "disregards the ruling that the FINRA rules and the terms of the Plan had to be harmonized" and that "compliance with both FINRA rules and the Plan was necessary to harmonize the two." (*See* D.I. 8 at 13-14, n.5) The court disagrees. While the *Karathansis* court noted that the plan and UPC 11140 could be read in harmony and also "recognize[d] that the net effect of its holding is that the Debtor may have to pay twice," this was only because the debtors in that case had already mistakenly made distributions under the FINRA Rules and were now required to pay according to the "plain and unambiguous" terms of the bankruptcy plan, which controlled.[20] *Karathansis* does not suggest that, had the debtors paid first in accordance with the plan, debtors would have been required to pay again in order to satisfy the FINRA Rules – the outcome that plaintiffs espouse here. *Karathansis* does not provide a basis for the relief that plaintiffs seek in the complaint.

Under well settled case law, defendants had a duty to comply with the Plan – not the FINRA Rules. *See Howe*, 913 F.2d at 1143 (it "is well settled that a plan is binding upon all

---

[20] Importantly, the *Karathansis* court did not address the possible unjust enrichment that could arise from such an outcome and remanded to the bankruptcy court for further proceedings. *See Karathansis*, 2007 WL 1234975, at *9.

26

parties once it is confirmed"); *see Karathansis*, 2007 WL 1234975 at \*9 (holding FINRA

Rules did not supersede plan).  The court agrees with the bankruptcy court's conclusion

that the FINRA Rules imposed conflicting obligations on defendants – not "concurrent and

additional obligations" – and that the Plan controls.  Absent the Plan being procured by

fraud, or plaintiffs establishing a due process violation, the doctrine of *res judicata* bars

plaintiffs from now contesting the Plan's distribution procedure, "even if only to argue that

the procedure omits important steps that [d]efendants should have been required to take."

*Arctic*, 2016 WL 3920855 at \*17.  While *res judicata* is a sufficient basis to affirm the

bankruptcy court's dismissal of the complaint, the court will also consider the merits of

plaintiffs' appeal of the bankruptcy court's conclusion that the releases contained in the Plan

and Orders provided an additional basis for dismissal.

### B.    Plaintiffs' Claims Are Barred by Releases in the Orders and Plan

#### 1.    Discharges and releases

The Plan and Orders contained broad release provisions shielding defendants from

liability for any actions or omissions related to, arising out of, or connected with the Plan.

##### a.    The Plan

Section 9.1 of the Plan contains the following broad release:

**On the Plan Implementation Date** and in accordance with the sequential steps and transactions set out in Section 8.3 of the [Plan], **the Arctic Glacier Parties**, the Monitor, Alvarez and Marsal Canada Inc. and its affiliates, the CPS, **the Trustees, the Directors and the Officers**, **each and every present and former employee** who filed or could have filed an indemnity claim or a DO&T Indemnity Claim against the Arctic Glacier Parties . . . and any Person claiming to be liable derivatively through any or all of the foregoing Persons (the "**Releasees**") **shall be released and discharged from any and all demands, claims, actions, causes of action**, counterclaims, suits, . . . and other recoveries **on account of any liability, obligation, demand or cause of action of whatever nature which any Person may be entitled to assert**, . . . whether known or unknown, matured or unmatured, direct, indirect or derivative, foreseen or unforeseen, **existing or hereafter arising, based in whole or in part on any omission, transaction, duty, responsibility, indebtedness, liability, obligation, dealing or other occurrence existing or taking place on or prior to the later of the Plan Implementation Date and the**

**date on which actions are taken to implement the [Plan] that are in any way related to, or arising out of or in connection with the Claims, the Arctic Glacier Parties' business and affairs whenever or however conducted, the [Plan], the CCAA Proceedings**, any Claim that has been barred or extinguished pursuant to the Claims Procedure Order or the Claims Officer Order . . . **and all claims arising out of such actions or omissions shall be forever waived and** released (other than the right to enforce the Arctic Glacier Parties' obligations under the [Plan] . . .) **all to the full extent permitted by applicable law**,[21] provided that **nothing in the [Plan] shall release or discharge a Releasee from any obligation created by or existing under the [Plan] or any related document**.

(A175-76, § 9.1 (emphasis added))  This release is effective as of the plan implementation

date (January 22, 2015).[22]

### b.    The Sanction Order

The Canadian court explicitly approved the Plan's broad release provision in the

Sanction Order: "[T]he Plan (including without limitation the . . . releases set out therein) is

hereby sanctioned and approved pursuant to the CCAA."  (A588 ¶ 9; *see also* A595, ¶ 28

(ordering and declaring that "the releases contemplated by the Plan are approved"); A589, ¶

11 (implementing releases as of the plan implementation date))  The Sanction Order also

included broad authorization and approval of any steps and actions taken by defendants

that are related to distributions:

> THIS COURT ORDERS that the Monitor, the Transfer Agent **and any other Person** required to make any distributions, payments, deliveries or allocations or take any steps or actions related thereto pursuant to the Plan **are hereby authorized and directed to complete such distributions**, payments, deliveries or allocations and to take any such related steps or actions, as the case may be, in accordance with the terms of the Plan, **and such distributions, payments, deliveries and allocations, and the steps and actions related thereto, are hereby approved**.

---

[21] The Plan defines "Applicable Law" as:

> any law, statute, regulation, code, ordinance, principle of common law or equity, municipal by-law, treaty, or order, domestic or foreign . . . having the force of law, of any Government Authority having or purporting to have authority over that Person, property, transaction, event or other matter and regarded by such Government Authority as requiring compliance.

(A151, § 1.1)

[22] A8-9, ¶¶ 39, 45 (asserting "Plan Implementation Date" is January 22, 2015).

(A591, ¶ 16 (emphasis added))  The Sanction Order also specifically released all claims

arising out of payment of the distribution:

> THIS COURT ORDERS that **none of the Monitor, the CPS, the Trustees, the
> Arctic Glacier Parties, or any individuals related thereto shall incur any liability
> as a result of payments and distributions to Unitholders**, in each case on behalf
> of AGIF, once such distribution or payment has been made by the Monitor to, and
> confirmation of receipt has been received by the Monitor from, the Transfer Agent.

(A600-01, ¶ 40 (emphasis added))  The Sanction Order further deems each unitholder as

having consented to the provisions of the Plan in their entirety, including the releases, and

provides that if there is any conflict between the Plan and any other agreement, the Plan

shall control:

> THIS COURT ORDERS that, as of the Plan Implementation Date [*i.e.*, January 22,
> 2015], **each** Affected Creditor and **Unitholder shall be deemed to have consented
> and agreed to** all of the provisions of the Plan in their entirety, and, in particular,
> each Affected Creditor and **Unitholder shall be deemed**: (a) **to have granted,
> executed and delivered** to the Monitor and the Arctic Glacier Parties all documents,
> consents, **releases**, assignments, waivers or agreements, statutory or otherwise,
> required to implement and carry out the Plan in its entirety; and (b) to have agreed
> that if there is any conflict between the provisions of the Plan and the provisions,
> express or implied, of any agreement or other arrangement, written or oral, existing
> between such Affected Creditor or Unitholder and the Arctic Glacier Parties as of the
> Plan Implementation Date, the provisions of the Plan take precedence and priority,
> and the provisions of such agreement or other arrangement shall be deemed to be
> amended accordingly.

(A592, ¶ 19 (emphasis added))  Finally, paragraph 29 of the Sanction Order provides an

injunction applicable to all "Releasees," which, as defined in § 9.1 of the Plan, includes all

defendants:

> THIS COURT ORDERS that **all Persons** shall be permanently and forever barred,
> estopped, stayed and **enjoined, from and after the Effective Time** [*i.e.*, 12:01 a.m.
> on the Plan Implementation Date of January 22, 2015], in respect of **any and all
> Releasees**, from: (i) commencing, conducting or continuing in any manner, directly
> or indirectly, **any action, suits, demands or other proceedings of any nature or
> kind whatsoever** (including, without limitation, any proceeding in a judicial, arbitral,
> administrative or other forum) **against the Releasees** . . . (iii) commencing,
> conducting or continuing in any manner, directly or indirectly, any action, suit or
> demand, including without limitation by way of contribution or indemnity or other
> relief, in common law or in equity, for breach of trust or breach of fiduciary duty,
> under the provisions of any statute or regulation, or other proceedings or any nature

or kind whatsoever (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against any Person who makes such a claim or might reasonably be expected to make such a claim, in any manner or forum, against one or more of the Releases . . . or (v) taking any actions to interfere with the implementation or consummation of the Plan; provided, however, that the foregoing shall not apply to the enforcement of any obligations under the Plan.

(A595-96, ¶ 29)

### c.    The Recognition Order

Pursuant to the Recognition Order, the bankruptcy court gave all provisions in the

Sanction Order "full force and effect in the United States" and further declared that no

liability can arise from AGIF's compliance with the Plan: "Neither the Debtors nor the

Monitor shall incur any liability as a result of acting in accordance with the terms of the Plan

and this Sanction Recognition Order."  (A465, ¶ 9)  The Recognition Order further: grants

defendants a broad release that was substantially the same as the one in the Plan,

discharging any claims "whether known or unknown, matured or unmatured" arising out of

or "in any way related" to the Plan, the bankruptcy proceedings, or AGIF's business affairs:

Debtors . . . the Trustees, the Directors and the Officers . . . shall be released and discharged from any and all demands . . . including any and all claims . . . whether known or unknown, matured or unmatured, direct, indirect or derivative, foreseen or unforeseen, existing or hereinafter arising, based in whole or in part on any omission, transaction, duty, responsibility, indebtedness, liability, obligation, dealing or other occurrence existing or taking place on or prior to the later of the Plan Implementation Date and the date on which actions are taken to implement the [Plan] that are in any way related to, arising out of or in connection with the Claims, the Debtor's business and affairs whenever or however conducted, the Plan, the Canadian Proceedings and the Chapter 15 Cases . . .

(A463-64, ¶ 5)

### 2.    The releases are sufficiently broad to bar plaintiffs' claims

In opposition to dismissal, plaintiffs argued that the release in paragraph 9 of the

Recognition Order, which states that AGIF shall not "incur any liability as a result of acting in

accordance with the terms of the Plan and this Sanction Recognition Order," is inapplicable

to their claims because plaintiffs "do not seek to hold [d]efendants liable because of any

acts **in accordance with** the Plan and Recognition Order." (A1157, ¶ 51 (emphasis in original)) Rather, plaintiffs asserted "liability is predicated on defendants' disregard of its concurrent and additional obligations under U.S. law that did not conflict in any respect with the Plan or Recognition Order." (*Id.*)

The bankruptcy court determined that the releases contained in the Plan and Orders were sufficiently broad to encompass plaintiffs' claims, which are all "predicated on not having received distributions." *See Arctic*, 2016 WL 3920855, at *18. In reaching this conclusion, the bankruptcy court observed that the releases: took effect on the plan implementation date of January 22, 2015 (A175-76, § 9.1; A589, ¶ 11; A592, ¶ 19; A595-96, ¶ 29); covered the period during which the alleged acts of misconduct occurred (December 2014 through January 22, 2015, when defendants made the distribution) (A463-64, ¶ 5); prohibited all claims against defendants "in any way related to, or arising out of or in connection with the Claims, the Arctic Glacier Parties' business and affairs whenever or however conducted, the [Plan], the CCAA Proceedings. . ." (A175-76, ¶ 9.1; *see also* A463 at ¶ 5); specifically prohibited "any liability as a result of payments and distributions to Unitholders . . ." (A600-01, ¶ 40); and included any actions or omissions (A175-76, § 9.1 ("all claims arising out of such actions or omissions shall be forever waived and released"). *See Arctic*, 2016 WL 3920855 at *18 (summarizing releases). The bankruptcy court rejected the "concurrent and additional obligations" argument in the context of the releases as well. *See id.* The bankruptcy court concluded that plaintiffs' claims, predicated on not having received the distributions, "clearly relate to, arise out of, or are in connection with the Plan's distribution procedure, whether the procedure as implemented involved actions taken for the benefit of the Selling Unitholders, or omissions of actions that would have benefitted [p]laintiffs." *Id.* at *18 (holding such actions call within § 9.1 of the Plan). The court finds no basis to disturb this conclusion. Plaintiffs' briefing on appeal does not substantively address

the scope of the releases.  Rather, plaintiffs assert that they are either not bound by the releases or that any enforcement of the releases would be in violation of their rights to due process.  The court finds no merit in plaintiffs' additional arguments addressed below.

### 3.    Plaintiffs are bound by the releases

In opposition to the motion to dismiss, plaintiffs argued that they were not bound by the releases because their claims arose after the dates that the Plan and Confirmation Orders were entered, and they had no connection to defendants as of those dates.  (*See* A1154-56)  The bankruptcy court rejected this argument, holding that the Plan was binding not only on the unitholders who voted to approve the Plan and participated in the bankruptcy proceedings, but also on their "successors and assigns" which include plaintiffs. *Arctic*, 2016 WL 3920855 at \*19.  On appeal, plaintiffs argue that the bankruptcy court "erred because it assumed, without undertaking an appropriate analysis, that the [selling unitholders] assigned [to plaintiffs] rights and obligations under the Plan (or that [defendants] somehow succeeded to such rights and obligations)" but "did not explain this or identify a recognized test for what constitutes an assignment."  (D.I. 8 at 24)  The court disagrees that the bankruptcy court did not undertake an appropriate analysis.  In reaching its conclusion that plaintiffs stepped into the shoes of the selling unitholders, and acquired no greater rights than the selling unitholders, the bankruptcy court relied on the *KB Toys* case, affirmed by the Third Circuit.  *See Arctic*, 2006 WL 3920855 at \*20 (citing *In re KB Toys*, 470 B.R. 331, 343 (Bankr. D. Del. 2012), *aff'd*, 736 F.3d 247 (3d Cir. 2013)).

In *KB Toys*, a chapter 11 trustee objected to proofs of claim filed by a purchaser of debtors' trade claims ("ASM") on the ground that the original claimants, from whom ASM purchased its claims, were in possession of avoidable preferences that they had yet to turn over or repay, thus the purchased claims must be disallowed under section 502(d) of the Bankruptcy Code.  *See KB Toys*, 470 B.R. at 331.  Under section 502(d), a bankruptcy

32

claim is disallowed if a claimant receives property that is avoidable or recoverable by the bankruptcy estate. *See* 11 U.S.C. § 502(d). In objecting to the claims, the trustee did not allege that ASM itself received an avoidable transfer, but rather that ASM's claims must be disallowed because each original claimant received a preferential transfer before transferring its claim to ASM. Conversely, ASM argued its claims should not be disallowed under section 502(d) because: (i) "any claim of any entity" as used in section 502(d) referred only to the claimant and, consequently, the disability was a personal allowance that remained with the original claimant; and (ii) its claims were entitled to protections of a good faith purchaser under section 550(b)[23] of the Bankruptcy Code.

The bankruptcy court disallowed ASM's claims, concluding that a claims purchaser holding a trade claim is subject to the same section 502(d) challenge as the original claimant: as the bankruptcy court put it, under section 502(d), "[d]isabilities attach to and travel with the claim." *Id.* at 335. In reaching this conclusion, the bankruptcy court carefully examined the text of the statute and the legislative history of section 502(d), noting that its predecessor, section 57g of the 1898 Bankruptcy Act, dealt with the right of a creditor to share in the debtor's assets within the distributive scheme of the statute, and provided that claims were not allowed until the creditor surrendered the preferential transfers to the estate. *Id.* at 336. Because section 57g established the basis for allowance or disallowance of particular claims, the legislative history supported a consistent interpretation

---

[23] Section 550 of the Bankruptcy Code governs the liability of a transferee of an avoided transfer, and subsection (b) provides that: "[t]he trustee may not recover . . . from a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or any immediate or mediate good faith transferee of such transferee." 11 U.S.C. § 550(b).

of its statutory successor, section 502(d), that disabilities travel with claims.  *See id.*[24]  On

appeal, the Third Circuit agreed with the bankruptcy court's analysis:

> The language of section 502(d) states that "any claim of any entity" who received an avoidable transfer shall be disallowed.  Thus, the statute operates to render a category of claims disallowable – those that belonged to an entity who had received an avoidable transfer.  Further, the statute provides that such claims cannot be allowed until the entity who received the avoidable transfer, or the transferee, returns it to the estate.  11 U.S.C. § 502(d) (stating that the trustee shall disallow such claims "unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable ...").  Accordingly, "any claim" falling into this category of claims is disallowable until the avoidable transfer is returned.  Because the statute focuses on claims – and not claimants – claims that are disallowable under § 502(d) must be disallowed no matter who holds them.

*KB Toys*, 736 F.3d at 252-53.

While plaintiffs argue on appeal that the bankruptcy court erroneously determined

that defendants succeeded to the rights and obligations of the selling unitholders without

undertaking an appropriate analysis, defendants do not attempt to distinguish the transfer of

a claim against a debtor in the course of the debtor's bankruptcy proceedings in *KB Toys*

from the transfer of an equity security in the course of a debtor's bankruptcy proceedings

here, or why a substitution of parties was not effected thereby.  *Compare* Fed. R. Bankr. P.

3001(e)(2) (stating, with regard to the transfer of a claim ". . . the transferred shall be

substituted for the transferor"); Black's Law Dictionary 1470 (8th ed. 2004) ("substitute"

means "one who stands in another's place"); *Carnegia v. Georgia Higher Educ. Assistance

Corp.*, 691 F.2d 482, 483 (11th Cir. 1982) (claim transfer "constituted a substitution of parties

with no change in the nature of the claim"); Rhodes, Transfer of Stock § 7.1 (7th ed., April

2017 update) ("As a general rule, the [stock] transferee takes no greater rights and is

---

[24] The bankruptcy court further rejected ASM's argument that it was entitled to the protections of a good faith purchaser argument, holding that ASM was a "sophisticated entity," well aware of the bankruptcy process, who had access to both the SOFA and the Original Claimants, and thus, was on "constructive notice" of the potential preference actions and could have discovered the potential for disallowance under section 502(d) with "very little due diligence."  *See KB Toys,* 470 B.R. at 342.

subject to the same liabilities as the [stock] transferor"). The Plan and Orders unambiguously provide that all unitholders are deemed to have approved the releases, whether they voted to approve the Plan or not, and that all unitholders are bound by the releases, including successors and assigns. (A592 at ¶ 19; A180-81 at ¶ 11.1 (deeming Plan approved by all unitholders); A161 at § 1.3 (providing releases apply to successors and assigns)) If purchasers of units are not "successors and assigns" of the unitholders as contemplated by the Plan, plaintiffs offer no alternative interpretation. As successors and assigns of the selling unitholders, plaintiffs acquired the same rights and obligations that the selling unitholders had in the units under the provisions of the confirmed Plan.

Plaintiffs' only attempt to distinguish *KB Toys* appears to hinge entirely on the distinction between a sale and an assignment. Plaintiffs argue that "[a]lthough [plaintiffs] did acquire their units," there was no assignment, because "those units did not come with all of the rights and obligations established by the Plan." (*Id.* at 26). Because there was no assignment, plaintiffs reason, they are not bound by the releases. Plaintiffs argue that "an assignment does not exist where only part of the assignor's interests in the property is transferred or where an assignor retains control over the fund or the right to receive funds. (*See id.* at 8, 26) Plaintiffs reason that, if an assignment had occurred, then plaintiffs would have received the distribution on account of the purchased units. (*See id.* at 23, 26) "Given that the [Selling] Unitholders undeniably retained rights under the Plan after they sold their units, an assignment from such unitholders to [plaintiffs] did not occur." (*See id.* at 26) Because the original claimants in *KB Toys* "did not retain contract rights relating to the property" they transferred – *i.e.*, their trade claims – plaintiffs argue that *KB Toys* has no application here. (*See* D.I. 8 at 26, n.8)

The bankruptcy court in *KB Toys* noted that the terms "assignment" and "sale" are not easily distinguishable and that, in the bankruptcy context, "use of the distinction

35

between the two terms has been widely criticized." *Id.* at 340 (citing criticisms). It further noted that "[t]he Bankruptcy Code does not define 'sale' or 'assignment,' although the [Bankruptcy] Code definition of 'transfer' arguably includes both." *Id.* at 340.[25] The bankruptcy court in *KB Toys* court went on to observe that, even if there was a principled way to distinguish between an assignment and a sale of the claims at issue, such an exercise in the context of its section 502(d) analysis, was "unhelpful and unrevealing of the appropriate outcome." *See id.* at 341. The distinction offers little assistance here as well. Plaintiffs' argument that the selling unitholders "retain[ed] contract rights relating to the property" and, thus, plaintiffs are not bound by the releases, is unpersuasive in light of the nature of the property transferred: selling unitholders could transfer, and plaintiffs could acquire, only those rights attached to the units as of the date they were purchased. The rights attached to the units on the date they were purchased did not include the right to receive distributions under the Plan. This does not alter the conclusion that transfer of units from the selling unitholders to plaintiffs intended to vest in plaintiffs any "present rights" in the units assigned – the right to receive future distributions – along with the obligations the units carried under the Plan. *See Miller v. Wells Fargo Bank. Intern. Corp.*, 540 F.2d 548, 55 (2d Cir. 1976) The court agrees with defendants: "to rule that a party that buys a bankruptcy claim after plan confirmation is not bound by the terms of the plan would completely undermine the certainty and finality a plan must provide in order to be effective."

---

[25] *See KB Toys*, 470 B.R. at 341 n.11 (explaining same). Section 101(54)(D) of the Bankruptcy Code defines "transfer" as "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with (i) property; or (ii) an interest in property." 11 U.S.C. § 101(54)(D). As the *KB Toys* court explained: "According to Black's Law Dictionary, a 'sale' is 'the transfer of property or title for a price' (citing Uniform Commercial Code § 2-106(1)), while an 'assignment' is 'a transfer of rights or property.' Therefore, a 'transfer' of property can be either an assignment or a sale." *KB Toys,* 470 B.R. at 341 n.11 (internal citations omitted).

(D.I. 10 at 29); *see also* 11 U.S.C. § 1127 (restricting post-confirmation plan modifications); *In re Philadelphia Newspapers, LLC*, 690 F.3d 161, 169 (3d Cir. 2012) (public policy of affording finality to bankruptcy judgments fosters confidence in finality of confirmed plans and facilitates successful reorganizations).

Plaintiffs further argue that even if they could be regarded as assignees of selling unitholders, plaintiffs' specific claims were never held by the selling unitholders and, thus, as a matter of law, the transferring unitholders could not have bound their assignees by any release. (*See* D.I. 8 at 26) According to plaintiffs, their claims are based on legal rights independent of, and separate from, the rights that the selling unitholders may have possessed: common law tort claims grounded in defendants' acts of negligence and fraud occurring after Plan confirmation, which resulted in injuries to plaintiffs and not the selling unitholders. (*See id.*) The court agrees with defendants that this argument fails to recognize that the Plan and Orders bar all claims related to payments and distributions to unitholders by any person. (*See* D.I. 10 at 30) The Plan specifically bars any claims that "**any Person** may be entitled to assert . . . whether known or unknown, matured or unmatured . . . foreseen or unforeseen, **existing or hereinafter arising**.") (A175-76, § 9 (emphasis added)). The broad language covers all claims, including those in existence at the time the Plan was approved and those arising after the fact, made by "any Person" in connection with the Plan's distribution procedure. The cases cited by plaintiffs do not address the enforceability of a plan release against an entity that buys a claim after plan confirmation and compel no different outcome. [26]

---

[26] *See Medtronic AVE Inc. v. Advanced Cardiovascular Systems*, 247 F.3d 44 (3d Cir. 2001) (determining whether manufacturer's pending patent infringement claims against competitor were subject to mandatory arbitration under a third-party's arbitration agreement with competitor following manufacturer's acquisition of the third party); *Longacre Master Fund, Ltd. v. ATS Automation Tooling Sys., Inc.*, 496 F. App'x 135, 139 (2d Cir. 2012) (determining sufficiency of allegations in breach of contract dispute between buyer of

### 4.    Enforcement of the releases does not violate due process

While the bankruptcy court recognized that "there are limits to the types of claims from which defendants can be shielded by a release," it also noted that the only relevant law plaintiffs proffered as being beyond the reach of the releases is the Due Process Clause of the U.S. Constitution. *Arctic*, 2016 WL 3920855 at *18.  A release is ineffective if a plaintiff's due process rights were violated in the confirmation of the plan. *See Bowen*, 174 B.R. at 844.  In opposition to the motion to dismiss, plaintiffs argued that "releases and/or discharges of claims in bankruptcy are unenforceable where, as here, claims arose after the date of the discharge or release and the plaintiffs' interests were not represented in the underlying bankruptcy proceeding." (A1152-53, ¶ 41)  Plaintiffs cited the Third Circuit's decision in *Chemetron* in support. *See Jones v. Chemetron*, 212 F.3d 199 (3d Cir. 2000). (A1154, ¶ 48)  In *Chemetron*, a plaintiff who was not yet born as of the date of a discharge in bankruptcy asserted personal injury claims based on his mother's exposure to toxic chemicals. *Chemetron*, 212 F.3d at 200.  The Third Circuit held that the discharge did not prevent claimant from pursuing his personal injury claims because

> [he] had no notice of or participation in the *Chemetron* reorganization plan.  No effort was made during the course of the bankruptcy proceeding to have a representative appointed to receive notice for and represent the interests of future claimants.  Therefore, whatever claim [plaintiff] may now have was not subject to the bankruptcy court's bar date order and was not discharged by that court's confirmation order.

*Id.* at 210 (citation omitted).  The bankruptcy court distinguished that case: "Unlike the *Chemetron* plaintiff, who was not yet born at the time of the bankruptcy discharge, [p]laintiffs here purchased units from the Selling Unitholders, who were either themselves appropriately noticed of the Plan and release it contained, or were the 'successors and

---

bankruptcy claim and seller); *Miller v. Wells Fargo Bank Int'l Corp.*, 540 F.2d 548 (2d Cir. 1976) (addressing trustee's claim to recover, as voidable preferences, payments by debtor).

assigns' of unitholders who participated in the bankruptcy proceeding." *Arctic*, 2016 WL 3920855 at *19.

Plaintiffs argue on appeal that the bankruptcy court erred in distinguishing *Chemetron*, which held that a due process violation occurs when a party whose claims are barred did not have both (i) notice of the plan, and (ii) its interests represented in in connection with the bankruptcy proceedings. (*See* D.I. 8 at 28-30) According to plaintiffs, the Canadian court should have "appointed [someone] to represent the interests of claimants in the position of the [plaintiffs]" – presumably, purchasers of units on the OTC "Pink" market[27] – and because it did not, the releases are ineffective under Third Circuit's decision in *Chemetron*. (*See id.*)

The court finds no merit in plaintiffs' attempt to analogize their position with that of the unborn personal injury claimant in *Chemetron*. The record demonstrates that unitholders received sufficient notice of the meeting, the Plan, and its releases. (*See* A356-401, ¶¶ 1.7, 5.10; A587, ¶ 3) The Plan was accepted by 99.81% of the unitholders who voted on it. (A218-19) Each unitholder was deemed to have consented and agreed to all of the provisions of the Plan in their entirety." (A592 at ¶ 19; *see also* A180-81 at ¶ 11.1) The Plan explicitly provides that it is binding not only on the selling unitholders but also on their

---

[27] See generally http://www.otcmarkets.com/marketplaces/otc-pink. The website provides that the OTC Marketplace is for "broker-dealers to trade all types of securities without requiring company involvement." (*See* A1125; http://www.otcmarkets.com/learn/otc101-faq) Companies listed on the OTC Link have been described by the SEC as "among the most risky investments." (*See* A1133; http://www.sec.gov/answers/pink.htm) The website also includes the following warning:

> With no minimum financial standards, this market includes foreign companies that limit their disclosure, penny stocks and shells, as well as distressed, delinquent, and dark companies not willing or able to provide adequate information to investors. As Pink requires the least in terms of company disclosure, investors are strongly advised to proceed with caution and thoroughly research companies before making any investment decisions.

http://www.otcmarkets.com/marketplaces/otc-pink.

"successors and assigns." (A161 at § 1.3) The record demonstrates that the selling unitholders received appropriate notice sufficient to satisfy due process and an opportunity to be heard regarding confirmation of the Plan. Unlike the unborn claimant in *Chemetron*, plaintiffs bought claims from unitholders who had notice of the insolvency proceedings and participated in those proceedings. The complaint does not allege that the due process rights of selling unitholders were violated during the bankruptcy proceedings, nor does it allege that plaintiffs did not have notice of the bankruptcy proceedings or the Plan.

The bankruptcy court correctly concluded that plaintiffs' claims are barred by the doctrine of *res judicata* and by the releases contained in the Plan and Orders. Based on the foregoing, the court need not consider the additional bases on which defendants assert that dismissal of the adversary proceeding should be affirmed.[28]

## VI. CONCLUSION

For the foregoing reasons, the bankruptcy court's opinion and order are affirmed, and plaintiffs' appeal is denied. An appropriate order shall issue.

---

[28] Defendants contend that: (i) the fraud claims must be dismissed because there is not a single factual allegation that defendants acted with the requisite scienter; (ii) the misrepresentation claims fail as a matter of law because plaintiffs have not adequately alleged actionable omissions or justifiable reliance; and (iii) the negligence claims do not satisfy pleading requirements because plaintiffs cannot show as a matter of law that defendants owed plaintiffs any duty to comply with Rule 10b-17 or the FINRA Rules. (*See* D.I. 10 at 34-39)